UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

TONY WU,

                        Plaintiff,

        -against-

METRO-NORTH COMMUTER
RAILROAD COMPANY d/b/a MTA
METRO-NORTH RAILROAD
and JIM HAW, in his individual
and official capacities,

                        Defendants.

Civil Action No. 1:14-cv-07015-LTS-FM

---

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS METRO-NORTH COMMUTER RAILROAD COMPANY d/b/a MTA METRO-NORTH RAILROAD AND JIM HAW'S MOTION FOR SUMMARY JUDGMENT PURSUANT TO FED. R. CIV. P. 56(a)**

---

On the brief:
Linda Wong, Esq.
Amelia Taylor, Esq.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ iii

INTRODUCTION ............................................................................................................... 1

PROCEDURAL HISTORY.................................................................................................. 1

STATEMENT OF MATERIAL UNDISPUTED FACTS .................................................... 2

LEGAL ARGUMENT......................................................................................................... 2

POINT I. ............................................................................................................................. 3

SUMMARY JUDGMENT SHOULD BE GRANTED TO METRO-NORTH DISMISSING
PLANTIFF'S CLAIM FOR AGE DISCRIMINATION UNDER THE ADEA ........................... 3

    A. Wu's Claim that He Suffered a Loss of Medical Benefits on the Basis of His Age is
       Meritless. .................................................................................................................. 4

    B. Plaintiff Has Suffered No Adverse Employment Action. ................................................ 5

    C. Metro-North's Actions Were Based on Legitimate, Nondiscriminatory Reasons.......... 8

       1. Wu's Job Performance Problems are Well Documented. ........................................... 8

       2. Metro-North Denied Plaintiff's Request for a Modified Work Schedule Based on
          Information Provided by His Doctors ...................................................................... 13

       3. Wu Cannot Show that His Claim that Metro-North's Alleged Failure to Address his
          Claims About Illegal Software Constituted Age Discrimination. .............................. 14

       4. Wu's Claims Relating to His Overtime are Meritless. ............................................... 15

       5. Metro-North's Denial of Wu's Submission to the IDEAs Program Had Nothing to Do
          With His Age. ......................................................................................................... 16

    D. Plaintiff's Age-Related Hostile Work Environment Claim Fails.................................... 19

POINT II. .......................................................................................................................... 20

SUMMARY JUDGMENT SHOULD BE GRANTED TO METRO-NORTH WITH RESPECT
TO PLAINTIFF'S CLAIM OF RETALIATION UNDER THE ADEA .................................... 20

POINT III........................................................................................................................... 26

SUMMARY JUDGMENT SHOULD BE GRANTED TO METRO-NORTH WITH RESPECT
TO PLAINTIFF'S CLAIM OF DISCRIMINATION UNDER THE ADA ................................ 26

    A. Plaintiff is Not Disabled under the ADA .................................................................... 27

    B. Plaintiff Cannot Show that He Suffered an Adverse Employment Action. ................... 28

    C. Plaintiff Cannot Show He Was Subjected to a Hostile Work Environment Because of
       Any Disability. ......................................................................................................... 29

POINT IV..........................................................................................................................29

SUMMARY JUDGMENT SHOULD BE GRANTED WITH RESPECT TO PLANTIFF'S
CLAIM OF RETALIATION UNDER THE ADA......................................................29

POINT V...........................................................................................................................31

HAW'S MOTION FOR SUMMARY JUDGMENT SEEKING DISMISSAL OF PLAINTIFF'S
FIRST AMENDMENT CLAIM SHOULD BE GRANTED ........................................31

CONCLUSION..................................................................................................................34

## <u>TABLE OF AUTHORITIES</u>

### <u>Cases</u>

<u>Agard v. N.Y. State Dep't of Taxation & Fin.</u>, 2012 U.S. Dist. LEXIS 34614 ( E.D.N.Y. Feb. 23 2012)………………………………………………………………………………………..32

<u>Almontaser v. New York City Dep't of Educ.</u>, 2014 U.S. Dist. LEXIS 92760 (E.D.N.Y. July 8, 2014)……………………………………………………………………………………….....19

<u>Anand v. New York State Dep't of Taxation & Fin.</u>, 2013 U.S. Dist. LEXIS 103324 (E.D.N.Y. July 24, 2013) ..................................................................................................... 6

<u>Bickerstaff v. Vassar Coll.</u>, 196 F.3d 435 (2d Cir. 1999) ........................................................... 30

<u>Brady v. Wal-Mart Stores, Inc.</u> 531 F.3d 127 (2d Cir. 2008). .................................................... 27

<u>Cioffi v. Averill Park Cent. Sch. Dist. Bd. Of Educ.</u>, 444 F.3d 158 (2d Cir. 2006) ..................... 32

<u>Cruz v. Coach Stores, Inc.</u>, 202 F.3d 560 (2d Cir. 2000). ........................................................... 21

<u>Dawson v. City of New York</u>, 2013 U.S. Dist. LEXIS 117744 (S.D.N.Y. Aug. 19, 2013)........... 7

<u>Dister v. Cont'l Group, Inc.</u>, 859 F.2d 1108 (2d Cir. 1988) ........................................................ 19

<u>Dotson v. City of Syracuse</u>, 2009 U.S. Dist. LEXIS 62174 (N.D.N.Y. July 21, 2009) .............. 32

<u>Fulghum v. Ebbarq</u>, 785 F.3d 395 (10th Cir. 2015) ............................................................... 4, 5

<u>Galabya v. N.Y. City Bd. Of Educ.</u>, 202 F.3d 636 (2d Cir. 2000) ................................................ 6

<u>General Elec. v. Varig S.A.</u>, 2004 U.S. Dist. LEXIS 1842 (S.D.N.Y. Feb. 10, 2004). ................. 2

<u>Gibson v. Wyeth Pharmaceuticals, Inc.</u>, 2011 U.S. Dist. LEXIS 23935 (S.D.N.Y. Mar. 9 2011) 7, 19

<u>Good v. Presbyterian Hosp.</u>, 934 F. Supp. 107 (S.D.N.Y. 1996). ................................................. 2

<u>Gorzynski v. JetBlue Airways Corp.</u>, 596 F.3d 93 (2d Cir. 2010) ........................................ 3, 21

<u>Gross v. FBL Fin. Servs.</u>, 557 U.S. 167 (2009) ............................................................................ 3

<u>Hahn v. Bank of Am. Inc.</u>, 2014 U.S. Dist. LEXIS 45886 (S.D.N.Y. March 31, 2014) ............. 24

<u>Hamilton v. Mount Sinai Hosp.</u>, 528 F. Supp. 2d 431 (S.D.N.Y. 2007) ...................................... 8

<u>Harris v, Forklift Sys. Inc.</u>, 510 U.S. 17 (1993)......................................................................... 19

<u>Hazen Paper Co. v. Biggins</u>, 507 U.S. 604 (1993) ....................................................................... 4

<u>Hicks v. Baines</u>, 593 F.3d 159 (2d Cir. 2010). ........................................................................... 21

<u>Katz v. Beth Israel Med. Ctr.</u>, 2001 U.S. Dist. LEXIS 29 (S.D.N.Y. Jan. 4, 2001) ..................... 7

<u>Kessler v. Westchester County Dept. of Soc. Servs.</u>, 461 F.3d 199 (2d Cir. 2006). ................... 21

<u>Lyda v. American Broadcasting Cos.</u>, 587 F. Supp. 670 (S.D.N.Y. 1984) ................................... 2

<u>Mabry v. Neighborhood Defender Serv.</u>, 769 F. Supp. 2d 381 (S.D.N.Y. 2011).......................... 7

<u>Maguire v. Level Sights, Inc.</u>, 2004 U.S. Dist. LEXIS 13566 (S.D.N.Y. Jul. 19, 2004) .............. 2

<u>Mazur v. N.Y. Dep't of Educ.</u>, 53 F. Supp. 3d 618 (S.D.N.Y. 2014)...................................... 3, 30

<u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973) ........................................................... 3

<u>McPherson v. New York City Dep't of Educ.</u>, 457 F.3d 211 (2d Cir. 2006). ................................ 3

<u>Morris v. Town of Islip</u>, 2014 U.S. Dist. LEXIS 133168 (E.D.N.Y. Sept. 22, 2014)................. 27

<u>Murray v. Visiting Nursing Servs. of N.Y.</u>, 528 F. Supp. 2d 257 (S.D.N.Y. 2007).................... 24

<u>Parcinski v. Outlet Co.</u>, 673 F.2d 34 (2d Cir. 1982) ................................................................. 26

Paul. V. Postgraduate Ctr. for Mental Health, 2015 U.S. Dist. LEXIS 42944 (E.D.N.Y. Mar. 31, 2015)..........................................................................................................................23

Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133 (2000)...........................................30

Ruhling v. Tribune Co., 2007 U.S. District LEXIS 116 (E.D.N.Y. Jan. 3, 2007)......................23

Sanders v. New York City Human Resources Admin., 361 F.3d 749 (2d Cir. 2004)...................6

Sethi v. Narold, 12 F. Supp. 3d 505 (E.D.N.Y Apr. 2 2014).......................................................33

Soderberg v. Gunther Int'l, Inc., 124 Fed. Appx. 30 (2d Cir. 2005) ..........................................18

Spaulding v. New York City Dep't of Educ., 2015 U.S. Dist. LEXIS 126292 (Sept. 21, 2015) . 29

Terry v. Ashcroft, 336 F.3d 128 (2d Cir. 2003)......................................................................3, 6

Tex. Dep't of Cmty Affairs v. Burdine, 450 U.S. 248 (1981)....................................................30

University of Texas Southwest Medical Center v. Nassar, 133 S. Ct. 2517 (2013)......................4

Vlad-Berindan v. MTA New York City Transit, 2014 U.S. Dist. LEXIS 171289 (S.D.N.Y. Oct. 8, 2014)..................................................................................................................................23

Wade v. New York City Dep't of Educ., 2014 U.S. Dist. LEXIS 32134 (S.D.N.Y. Mar. 10, 2014) ...............................................................................................................................................3

Walder v. White Plains Board of Educ., 738 F. Supp. 2d 483 (S.D.N.Y. 2010).........................23

Widomski v. State Univ. of New York (SUNY) at Orange, 748 F. 3d 471 (2d Cir. 2014)..........30

Wright v. Storch, Amini & Munves, P.C., 2014 U.S. Dist. LEXIS 58037 (S.D.N.Y. Apr. 25, 2014)..............................................................................................................................21, 26

Young v. County of Nassau, 2011 U.S. Dist. LEXIS 106316 (E.D.N.Y. Sept. 21, 2011).........4, 5

**U.S. Constitution**

Amendment I………………………………………………………….................1, 3, 31, 32

Amendment XIV………………………………………………………...1, 3, 6, 7, 31, 32

**Statutes**

29 U.S.C. § 621.................................................................................................... passim

42 U.S.C. § 12101................................................................................................ passim

42 U.S.C. § 12102(1). ...............................................................................................27

**Regulations**

29 C.F.R. § 1630.2(i)(1)(i)……………………………………………………………27

**Rules**

Fed. R. Civ. P. 56(a) .................................................................................................1,2

Fed. R. Civ. P. 12(b)(6)..........................................................................................1, 2

Fed. R. Civ. P. 15(a)(1) ...............................................................................................1

L. Civ. R. 56.1 ............................................................................................................2

## INTRODUCTION

Defendants Metro-North Commuter Railroad Company d/b/a MTA Metro-North Railroad ("Metro-North") and Jim Haw ("Haw") ("Defendants"), hereby move for summary judgment, pursuant to Fed. R. Civ. P. ("FRCP") 56(a), seeking dismissal of this action, filed by Plaintiff Tony Wu ("Plaintiff" or "Wu").

## PROCEDURAL HISTORY

On August 28, 2014, Plaintiff commenced this action against Defendants, alleging that: 1) Metro-North discriminated and retaliated against him, in violation of the Americans With Disabilities Act, 42 U.S.C. §§ 12101, *et seq.* ("ADA"); 2) Metro-North discriminated and retaliated against him, in violation of the Age Discrimination in Employment Act, 29 U.S.C. §§ 621, *et seq.* ("ADEA"); 3) Haw violated his rights under the Equal Protection Clause of the 14th Amendment of the U.S. Constitution under 42 U.S.C. § 1983 ("§ 1983"); and 4) Haw violated his right to freedom of speech under the First Amendment and Due Process Clause of the Fourteenth Amendment of the U.S. Constitution under § 1983.  (Complaint ¶¶ 1-82.)

On December 10, 2014, Defendants filed a motion to dismiss the Fifth and Sixth Claims of the complaint, under FRCP 12(b)(6), for failure to state a claim upon which relief can be granted. Plaintiff thereafter sought leave from the Court to add additional factual allegations pursuant to FRCP 15(a)(1) in support of his First Amendment claim.  By Order, dated December 17, 2014, the Court terminated the motion to dismiss without prejudice, allowing Plaintiff to file an amended complaint by December 29, 2014.

On December 29, 2014, Plaintiff filed his Amended Complaint alleging the same causes of action in the original complaint, but adding factual allegations in an effort to bolster his constitutional claims.  Defendants then moved to dismiss the Fifth and Sixth Claims of the

Amended Complaint, pursuant to FRCP 12(b)(6), for failure to state a claim upon which relief can be granted.  This Court, on September 22, 2015, dismissed all of the constitutional claims against Haw except for Wu's narrow claim alleging that he was subject to retaliation when Haw purportedly delayed the processing of Wu's submission under an employee suggestion program in 2014 because Wu filed a charge of discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC") on October 30, 2013.

Defendants now move for summary judgment under FRCP 56(a) on all counts.

## STATEMENT OF MATERIAL UNDISPUTED FACTS

Defendants respectfully refer the Court to their Statement of Material Undisputed Facts annexed to the Notice of Motion for Summary Judgment, as required by Local Civil Rule 56.1.

## LEGAL ARGUMENT

Summary judgment is appropriate where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FRCP 56(a).  The moving party has the burden of demonstrating the absence of a genuine issue of material fact, but the party opposing a motion for summary judgment cannot rely on mere allegations or denials to demonstrate that a dispute exists. Lyda v. American Broadcasting Cos., 587 F. Supp. 670 (S.D.N.Y. 1984); Good v. Presbyterian Hosp., 934 F. Supp. 107 (S.D.N.Y. 1996).  Speculative and conclusory allegations are insufficient to meet a nonmoving party's burden. Good, 934 F. Supp. at 110; Maguire v. Level Sights, Inc., 2004 U.S. Dist. LEXIS 13566 (S.D.N.Y. Jul. 19, 2004). The party opposing a motion for summary judgment must do more than simply show that there is some metaphysical doubt as to material facts, and must set forth specific facts showing that there is genuine issue for trial.  General Elec. v. Varig S.A., 2004 U.S. Dist. LEXIS 1842 (S.D.N.Y. Feb. 10, 2004).

2

## POINT I.

## SUMMARY JUDGMENT SHOULD BE GRANTED TO METRO-NORTH DISMISSING PLANTIFF'S CLAIM FOR AGE DISCRIMINATION UNDER THE ADEA

Metro-North should be granted summary judgment, dismissing Plaintiff's ADEA claims, because he has failed to present facts that would allow a reasonable juror to find in his favor.  See, Mazur v. N.Y. Dep't of Educ., 53 F. Supp. 3d 618 (S.D.N.Y. 2014)(granting summary judgment where no reasonable jury could find that the plaintiff was subject to discrimination or retaliation under the ADEA, ADA, First Amendment and Equal Protection Clause).

A claim for age-based employment discrimination is analyzed under the burden shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See, Wade v. New York City Dep't of Educ., 2014 U.S. Dist. LEXIS 32134 (S.D.N.Y. Mar. 10, 2014), citing Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 110 (2d Cir. 2010). A plaintiff must establish a prima facie case of age discrimination by demonstrating that 1) he was within the protected age group, 2) he was qualified for the position, 3) he experienced an adverse employment action, and 4) such action occurred under circumstances giving rise to an inference of discrimination.  Id.; Terry v. Ashcroft, 336 F.3d 128 (2d Cir. 2003).  Once the plaintiff sets out a prima facie case, the defendant must proffer a legitimate, nondiscriminatory reason for the adverse employment action to avoid a presumption of discrimination, in which case, the presumption evaporates and the plaintiff then must prove that the employer's proffered reason was a pretext for discrimination.  McPherson v. New York City Dep't of Educ., 457 F.3d 211 (2d Cir. 2006).

The burden of persuasion in an ADEA case, requires the plaintiff to "prove by a preponderance of the evidence that age was the "but-for" cause of the challenged employer decision." Gross v. FBL Fin. Servs., 557 U.S. 167 (2009). Thus, the plaintiff carries the burden to prove the alleged unlawful action "would not have occurred in the absence of the alleged wrongful

3

action or actions of the employer." <u>University of Texas Southwest Medical Center v. Nassar</u>, 133 S. Ct. 2517, 2533 (2013).

    A.  Wu's Claim that He Suffered a Loss of Medical Benefits on the Basis of His Age is Meritless.

There is no merit to Wu's claims that Metro-North took away his lifetime medical benefits based of his age. The record is clear that Wu, together with all the other Database Administrators ("DBAs") in the Metro-North Information Technology Department ("IT"), lost those benefits in September 2013, when the DBAs were accreted to the Transportation Communications International Union ("TCU").  (56.1¶ 34, 35),[1] To make out a claim for disparate treatment, the protected trait must have "actually played a role in [the] process and had a determinative influence on the outcome." <u>Young v. County of Nassau</u>, 2011 U.S. Dist. LEXIS 106316 (Sept. 21, 2011), <u>aff'd</u>, 2013 U.S. App. LEXIS 2371 (2d Cir. Feb. 4, 2013), quoting <u>Hazen Paper Co. v. Biggins</u>, 507 U.S. 604, 610 (1993); see also, <u>id.</u> at 609 ("[T]here is no disparate treatment under the ADEA when the factor motivating the employer is some feature other than the employee's age."). "C]laims that stress 'disparate impact' involve employment practices that are facially neutral in their treatment of different groups, but that in fact fall more harshly on one group than another…" <u>Id.</u>  Even if the plaintiff can show that a policy that is facially neutral has a disparate impact, it is not discriminatory if the defendant can show that it was justified based on "reasonable factors other than age." <u>Fulghum v. Ebbarq</u>, 785 F.3d 395 (10th Cir. 2015)

The collective bargaining agreement ("CBA") between the TCU and Metro-North took effect, on June 5, 2013, and provided that all employees lost their lifetime medical coverage upon retirement, unless those employees who were eligible to retire, did so by September 5, 2013. (56.1¶

---

[1]Factual citations to the record in Defendants' Statement of Material Undisputed Facts are referenced as "56.1¶."

40, 41).  The CBA gave eligible employees an extended period of time to retire with lifetime medical benefits, actually benefitting older workers over younger workers. The elimination of lifetime medical benefits was based on "reasonable factors other than age," namely the accretion of DBA positions into the union. (Id.) In fact, in his 2012 complaint to the MTA Office of Inspector General ("OIG"), Wu wrote, "It appears that MNR management and TCU representatives care more about their budget control (MTA/MN) and membership power (TCU) rather than the valuable benefits offered to its dedicated IT employees," thus acknowledging that the motivation behind the change was union membership, not age.

The Second Circuit has reaffirmed that an across the board reduction or elimination of benefits does not violate the ADEA.  See, Young v. County of Nassau, *supra* (Plaintiffs failed to state a claim of disparate treatment or disparate impact under the ADEA where termination pay was capped at two times final salary and cap did not apply if employees chose to retire before July 1, 2009, because age was not the motivating factor, the cap affected all employees regardless of age and the policy actually advantaged older workers who had the option of retiring whereas the younger workers did not). See also, Fulghum v. Ebbarq, *supra* (summary judgment granted on disparate impact claims involving reduction or termination of life insurance benefits where plaintiff failed to present statistical evidence and decision was based on a "reasonable factor other than age," i.e., the desire to reduce costs and provide competitive benefits).

B.   Plaintiff Has Suffered No Adverse Employment Action.

This Court has already dismissed Wu's constitutionally based age-related disparate treatment claims against Haw, then Deputy Director, Platform Applications and Support and Ticket Selling Machines ("TSM") Systems, because he could not show he was subject to adverse employment actions. The elements of proof for a constitutionally based age discrimination

5

disparate treatment claim are the same as those required under the ADEA, with both statutes applying the McDonnell-Douglas burdens of proof. Anand v. New York State Dep't of Taxation & Fin., 2013 U.S. Dist. LEXIS 103324 (E.D.N.Y. Jul. 24, 2013). The Court, based upon its prior reasoning, should dismiss Plaintiff's ADEA claim because he not was subject to any adverse employment action.

This Court, in dismissing Wu's claim under the Equal Protection Clause, instructed that:

> In the disparate treatment context, an adverse employment action must be a "materially adverse change" in the terms and conditions of employment. [Galabya v. N.Y. City Bd. Of Educ., 202 F.3d 636, 640 (2d Cir. 2000)]. Such a change must be "more disruptive than a mere inconvenience or an alternation of job responsibilities," and may include scenarios such as "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits [or] significantly diminished material responsibilities." Id.

Memorandum Opinion and Order, Document 87 ("Order"), at 19. See also Sanders v. New York City Human Resources Admin., 361 F.3d 749, 755 (2d Cir. 2004) (To be materially adverse, a change in working conditions must be "more disruptive than a mere inconvenience or an alteration of job responsibilities") citing, Terry, 336 F.3d at 141.

Consistent with its analysis, this Court ruled that Wu's claimed actions that Haw made remarks to him to pressure him into retiring, assigned him tasks with unreasonable deadlines, sent him a "negative" memorandum and forced him to participate in a performance plan, and that Defendants delayed submission of his proposal to the Metro-North IDEAS program and failed to remedy perceived discrimination of which he complained, are not, as a matter of law, adverse employment actions for the purposes of Wu's disparate treatment claims. (Order, at 19.) The Court also noted that Plaintiff remains employed by Metro-North, earning the highest salary of all of the DBAs. (56.1 ¶161.) He was never demoted from his DBA 4 position, nor did he suffer diminished material responsibilities. Id. at 19-20. (56.1 ¶ 163.) Plaintiff testified that he has job security with

6

his current supervisor, K.C. Stubbs, Senior Manager-Technical Support ("Stubbs"), and has been "very happy" with his current job, and from August or September 2014 to present, he has felt comfortable in his job. (56.1 ¶164-165.)

The Court found the acts complained of "fall squarely within the category of disruptive inconveniences that courts within this district have rejected as insufficient to constitute adverse employment actions for the purposes of Equal Protection Claims." (Id.). These same purported acts also fail to constitute adverse employment actions under the ADEA, including  Wu's claim that a July 22, 2013 memorandum from Haw to him ("the July 22 memo"), other written documentation concerning his poor job performance and weekly meetings designed to improve his work constitute age discrimination. It is well-established that a negative performance review, standing alone, does not constitute an adverse employment action. See, Gibson v. Wyeth Pharmaceuticals, Inc., 2011 U.S. Dist. LEXIS 23935 (S.D.N.Y. Mar. 9, 2011) (negative evaluation did not constitute an adverse employment action where plaintiff failed to establish any adverse consequences of the negative evaluation).  See also, Dawson v. City of New York, 2013 U.S. Dist. LEXIS 117744, at *26-7 (S.D.N.Y. Aug. 19, 2013) (Plaintiff's claims that she was reprimanded and subjected to excessive monitoring, scrutiny and criticisms of her job performance, resulting in an "Unsatisfactory" rating and comments were made such as,  "[w]hen will you be retiring," and "You are a dinosaur," were not sufficient to defeat summary judgment.); Mabry v. Neighborhood Defender Serv., 769 F. Supp. 2d 381 (S.D.N.Y. 2011) (excessive scrutiny and close monitoring without more does not constitute adverse employment action); Katz v. Beth Israel Med. Ctr., 2001 U.S. Dist. LEXIS 29 (S.D.N.Y. Jan. 4, 2001) ("being yelled at, receiving unfair criticism, receiving unfavorable schedules or work assignments, and being told to retire or work part time if she did

not like the schedule … do not rise to the level of adverse employment actions" as "they do not affect any ultimate employment decisions").

Haw's remark to Wu stating, "Tony if it was that important to me and I could do it financially, I would retire, but you have to make that decision" (56.1 ¶ 44.) shows no discriminatory animus and is at most a stray remark, and as noted previously by this Court, does not constitute an adverse employment action.  See, Hamilton v. Mount Sinai Hosp., 528 F. Supp. 2d 431, 447 (S.D.N.Y. 2007) ("[D]iscussion of retirement is common in offices, even between supervisors and employees, and is typically unrelated to age discrimination.").

Thus, Wu's ADEA claim should be dismissed, because he cannot demonstrate that the asserted actions by Metro-North constitute adverse employment actions.

C.  Metro-North's Actions Were Based on Legitimate, Nondiscriminatory Reasons

Assuming arguendo that Wu can show he suffered an adverse employment action, there is no basis to his claims that Metro-North was in any way motivated by Wu's age.  Rather, all of these actions were based upon nondiscriminatory, legitimate business decisions.  Plaintiff is therefore also unable to establish the fourth element of his *prima facie* case that such actions occurred under circumstances giving rise to an inference of discrimination.

1.  Wu's Job Performance Problems are Well Documented.

Wu has had a history of poor performance since 2004, documented by different supervisors or managers who worked directly with him, at different times, and by his coworkers. (56.1 ¶ 4-21, 38, 48-80, 89-101.) Wu, from 2001 to June 5, 2013, was a DBA, Level F. The job description for this position included responsibilities to, among other things, define data process flows, perform data modeling, develop and tune database tables and triggers, perform backup procedures, add users, and support the Metro-North database across platforms. (56.1 ¶ 2.)

Wu was placed into the DBA 4 position on June 5, 2013, as a result of his DBA position being accreted to the TCU (56.1¶38-40.) The DBA 4 job description requires, among other things, that Wu design and oversee the installation, configuration and maintenance of database technologies, perform database administration tasks, design, configure and install database software modules and applications, develop system backups, work with others to coordinate database infrastructure, troubleshoot issues as they arise, ensure all required system documentation and recordkeeping are accurate, participate in the evaluation of new database products, guide less senior DBAs, design, engineer and document solutions and standards and contribute to the planning and coordination of tasks associated with database installations.  (56.1 ¶ 3.)

Wu's performance problems since 2004 are well documented. (56.1 ¶ 4.) His supervisor, Suresh Konappanavar, Manager, Database Administration ("Konappanavar"), noted in Wu's performance evaluations in 2004 and 2005, that Wu "needs to take more time to fully understand my expectations on assigned tasks," and in 2004, that "Wu had to redo several tasks after I reviewed his work." (56.1¶ 8, 10)  He also noted in 2005, that Wu did not properly handle backups of data on the server, pay attention to detail, properly format reports and timely update his documentation. (56.1 ¶ 9.) In 2006, Konappanavar noted that Wu did not handle backups and updates correctly, and Wu's documentation for a backup on another occasion did not work. (56.1 ¶ 12, 13.)  In 2007, Konappanavar Wu's numerous performance problems, including an error committed by Wu when he deleted three months of work of ARC logs, which are database archive activities performed on a server, causing Metro-North to have a production outage for five hours to run a new backup.  (56.1 ¶ 15.)  Wu's subsequent manager, Jim Robinson, in 2008, noted that Wu needed improvement in paying attention to details, and had problems with performing backups, and in 2009, Robinson noted that Wu had a problem in performing maintenance tasks.

(56.1 ¶ 19-21.)  In 2011, Haw wrote in Wu's performance evaluation, "Quality of work is an area of concern."  (56.1 ¶ 26.)   Wu was ranked the lowest in terms of skill level and promotability of the five DBAs in IT in a nine box evaluation chart prepared by his supervisors in March 2012, for the purpose of assisting Vincent Mezzanotte ("Mezzanotte"), in assuming his duties as Interim Chief Information Officer at that time.  (56.1 ¶ 38.)

Wu's poor job performance was identified by several of his supervisors in 2013. Wu was unable to perform fundamental tasks as a DBA, such as on June 23, 2013 when Wu asked Rasheed Sonson, a Server Administrator ("Sonson"), to start a database for him after a cluster failure issue, when the starting and stopping of databases was Wu's responsibility as a DBA. (56.1¶48.) Sonson's supervisor, Charles L. Nottingham III, ("Nottingham"), brought this problem to Haw's attention. (Id.) Wu demonstrated his inability to perform the responsibilities of a DBA 4, including designing, implementing, maintaining, tuning and optimizing MNR databases and developing system backup schedules, verification testing and related documentation, when he advised Haw that he did not perform tasks on a regular basis for backup, recovery, performance, and tuning and to maintain the environment. (56.1 ¶49.) Haw spoke to Wu on June 27, 2013 about Wu's performance problems which Haw had observed from April and June 2013, which included Wu's inability to log on to Oracle Enterprise Manager ("OEM"), the tool used to manage the database environment; his failure to follow up to make sure the database was fully functional after an OEM database alert was received; and the aforementioned June 23, 2013, incident when Wu asked Sonson to start a database for him after a cluster failure.  Haw told Wu that any one of these problems "would be understandable, but the 3 together is something for me to be concerned about." Wu admitted his mistakes, stating to Haw, "No problem, it won't happen again." (56.1 ¶50.) Wu demonstrated that he was consistently unable to perform a task without being given specific

instructions, for example, on July 17, 2013, he was assigned to work on a project that involved establishing a new production environment for the MNR People Soft ("PS") Legacy Data Access reporting databases.  (56.1¶51.)   On July 18, 2013, Wu sent a series of emails to Haw and Miro Narodetskiy, one of his coworkers ("Narodetskiy"), asking for direction on simple tasks, such as how to reset his Oracle support ID and password and locate a basic document for performing a backup function.   In the same e-mail chain, Wu also asked, "What's "Data Domain"?".  This question shocked Haw, as Data Domain is a product that was the target storage device used for Recovery Manager "RMAN", [define], and had been discussed numerous times in meetings with all the DBAs.  As a DBA 4, Wu should have known how to research information about the product and how to use it to perform his job functions before coming to his manager or other DBA staff. (56.1 ¶¶51-52.)  On August 22, 2013, Narodetskiy sent an e-mail to Haw stating that he wanted "to draw [his] attention to the level of questions" that he was getting from Wu about basic tasks discussed many times in meetings.  (56.1 ¶63.)

These performance problems were documented in numerous emails and memoranda, including a July 22, 2013 memorandum to Wu from Haw ("the July 22 memo").  Haw, and later Michael La Chapelle, then Director, IT Infrastructure ("La Chapelle"), and Haw's supervisor, met with Wu weekly after the July 22 memo to provide him feedback in order to improve his performance.  (56.1 ¶ 58, 60.)  Wu's performance never improved during these weekly meetings and he was still unable to meet the deadlines in completing his work, exhibiting a lack of basic understanding with regard to his job responsibilities.  (56.1 ¶ 61.)

Wu's performance problems were also documented by La Chapelle, Mezzanotte, who became Metro-North's CIO in December 2012, and other coworkers, who all voiced frustration at Wu's inability to perform his job as well as his insubordination and rudeness to them and others. (56.1

¶¶ 61- 72.) For example, in a September 16, 2013 email, La Chapelle expressed disappointment in how Wu responded to Haw's feedback and his demonstrated lack of initiative to resolve issues on his own, after Wu wrote in an email to Haw, "In the future, if it only takes five minutes, don't take five days to respond." (56.1 ¶ 71.)   In or around September 19, 2013, Mezzanotte, La Chapelle and Haw jointly discussed disqualifying Wu from his position as a DBA 4, because it became apparent that Wu's performance was deficient and he was unable to perform the job requirements for his position. (56.1 ¶ 73.)   In November 2013, after months of attending meetings with Wu and Haw and concluding that Wu's job performance was still unsatisfactory, La Chapelle wrote a memorandum to Mezzanotte, recommending that Wu either be demoted or disqualified from his DBA 4 position.  (56.1 ¶ 74.)  In an email, dated November 12, 2013, Mezzanotte expressed to Haw and La Chapelle that, "Tony needs to be disqualified [from his position] immediately based on his attitude and inability to meet the demands of the DBA Level 4 position.  He is contributing to a hostile work environment and our attempts to help him are insurmountable." (56.1 ¶ 76.) La Chapelle had also received a memorandum, dated November 11, 2013 from Wu, complaining about Haw's poor management and planning, and that during a meeting on November 6, 2013, Haw pointed his finger at Wu which Wu alleged to constitute discrimination, intimidation and insult toward him. La Chapelle refuted all of Wu's claims in a memorandum, dated December 2, 2013, and further advised Wu:

> Over the past few months, I have been working to objectively assess your role and attempt to facilitate your ability to meet the expectation of your job. During this timeframe, Jim has assisted you in every way possible to help you become a productive member of the group, however, you continue to not meet your goals and demonstrate behavior to the contrary of working cooperatively as part of the team. This most recent email to me further demonstrates that you not only fall short of the requirements of the Database Administrator Level 4 position but also do not understand the responsibilities of the position.

(56.1 ¶ 75, 80.)

Wu's performance problems continued in 2014 to date, as observed by Haw, Mezzanotte, David Koehler ("Koehler"),[2] , and K.C. Stubbs, Senior Manager, Technical Support ("Stubbs"), his current supervisor who assumed supervising all DBAs in the spring of 2014. (56.1 ¶¶89-101.) On January 17 and 29, 2014, Wu complained to his managers that he was unable to complete his assignments because of "lack of training," and he continued to demonstrate that he did not understand his job responsibilities.  (56.1 ¶83, 84.)  Mezzanotte advised Wu once again that as a DBA 4, he should have been able to research new technologies to design, engineer and document solutions and standards, and at his level "should be identifying new tools and technologies," something he was unable to do. (56.1 ¶ 84.)  In addition, Stubbs exchanged numerous emails with Wu concerning his performance, in 2014, to no avail. (56.1 ¶ 89-100.) On or about June 15, 2014, Wu was assigned to troubleshoot the upgrade of the WMDS database, a typical task of a DBA 4. He could not accomplish the task and Stubbs had to assign another DBA, Narodetskiy, to intervene to resolve the issue. Id. On August 13, 2014, Stubbs directed Wu to refrain from working overtime because of his inability to troubleshoot issues on two occasions. (56.1 ¶ 98.)

2.  Metro-North Denied Plaintiff's Request for a Modified Work Schedule Based on Information Provided by His Doctors

Plaintiff also claims that he was denied, on December 16, 2013, a modified work schedule so that he could leave one hour early, five days a week, to see his psychologist and physical therapist, because of age discrimination. There is simply no evidence whatsoever that Metro-North's decision is based on age.  Metro-North reviewed this request and contacted Wu's physicians to determine his needs.  Specifically, Metro-North contacted Plaintiff's neurologist, Ziao-Ke Gao, M.D., whose office provided Wu with physical therapy and his psychologist, Dr.

---

[2] Koehler was Acting Chief Information Officer from July 2013 to December 31, 2005 and has been Chief of Transportation Applications since January 1, 2015.

Yuanxia Zhang.  Dr. Gao stated that contrary to Wu's representations, Wu did not need to leave work early to attend physical therapy appointments with him, because Dr. Gao had physical therapy offices in Manhattan which did not close until 7:00 p.m., and therefore Wu could receive physical therapy in Manhattan, rather than at Dr. Gao's Flushing office.  (56.1¶112)  Dr. Zhang advised Metro-North that Wu did not need to leave work early five days a week; rather, he could leave early one day a week and another day, as needed, for counseling sessions at Dr. Zhang's Flushing office.  (56.1 ¶ 112.)  Dr. Zhang, also revealed in his deposition, that he had Sunday hours when Wu could have scheduled his counseling appointments, rather than during the workweek.  (56.1 ¶ 113.)  As it also turned out, Wu never left work early more than once a week to visit Dr. Zhang, and according to Dr. Zhang's records, there were many gaps in time when Wu did not see Dr. Zhang at all for weeks and even months, and effective January 2015, Wu terminated his treatment with Dr. Zhang.  From July 26 to December 26, 2013, Wu only saw Dr. Zhang for 13 visits; thereafter, he only saw him for therapy on April 22, 2014, September 22, 2014 and January 11, 2015. (56.1 ¶113.) Other than a few calls with Dr. Zhang, Wu has not undergone treatment by Dr. Zhang since January 11, 2015. (56.1 ¶113.)

Therefore, Metro-North, in accordance with specific information provided by Wu's doctors, granted Wu an accommodation to leave work early one day a week, with another day, as needed.  Such decision had nothing to do with Wu's age.

3.  Wu Cannot Show that His Claim that Metro-North's Alleged Failure to Address his Claims About Illegal Software Constituted Age Discrimination.

Wu alleges that Metro-North refused to acknowledge his concerns about the use of unlicensed software as part of a discriminatory environment based on his age. In fact, Koehler, received several emails from Wu on June 26 and 30, 2014, complaining about the use of unlicensed software, met with Wu on July 1, 2014, and informed him that he was mistaken about the use of

14

software, which was either approved for use in a testing environment or under a license that was available to all MTA subsidiaries, including Metro-North. (56.1 ¶ 120.) There is simply no evidence that Wu's complaints and the manner they were addressed had anything whatsoever to do with Wu's age.

    4.   Wu's Claims Relating to His Overtime are Meritless.

There is also no merit to Wu's claims that he was required to work 38 consecutive hours and denied overtime because of age discrimination. Rather, Wu worked 38 consecutive hours in June 2014, because he was unable to complete his assignment to perform scheduled maintenance. In addition, Wu was denied overtime on occasion, because in each case, he failed to troubleshoot problems with the database or to fix the problems he was assigned to address; on those occasions, other DBAs or his supervisors had to intervene and remedy the problems.

Specifically, on May 14, 2014, Wu was assigned to troubleshoot a database problem and he worked from 7:40 p.m. to 1:10 a.m. and abandoned the project and deferred the work until the next day.  Narodetskiy, Wu's coworker, intervened and solved the problem in a short of amount of time.  Wu was denied overtime on May 28, 2014, because he was unable to troubleshoot the system.  On June 26, 2014, Wu filed a union grievance to appeal the denial and his appeal was denied by Metro-North, on July 18, 2014. (56.1 ¶ 140.)

During the weekend of August 9, 2014, Wu was unable to successfully complete a maintenance assignment and worked overtime. Despite having failed to complete the assignment, Wu was paid for the overtime hours. As noted above, on August 13, 2014, Wu was advised by Stubbs that going forward, Wu would not be permitted to work overtime, because of his inability, on two occasions, to complete his assigned scheduled maintenance on overtime.  (56.1¶141.)

[It is significant that Wu was denied for overtime on May 17, 2011 by another supervisor, Jim Robinson, Assistant Director, Database Administration & Disaster Recovery, because he had been unable to log onto the system and perform any work to troubleshoot the system.  (56.1¶136.) Thus, this was not the first time Wu was denied overtime because of his poor performance, and it had nothing to do with his age.]

Because Wu cannot show that his age had anything whatsoever to do with the decisions to deny him overtime, this claim should be dismissed on summary judgment.

5.   Metro-North's Denial of Wu's Submission to the IDEAs Program Had Nothing to Do With His Age.

Wu claims that Metro-North denied his submission to the IDEAs Program on the basis of his age.  However, the record shows that Wu's suggestion was not approved because it would not have resulted in any significant savings or properly secure data on Metro-North's back-up systems. (56.1¶ 132.)  The decision to deny Wu's suggestion was initially made by Haw and Mezzanotte, and later reaffirmed on an appeal by Koehler.  (56.1 ¶ 132-135.)  There is no evidence linking the decision to deny Wu's suggestion to his age.

The IDEAS Program is governed by the Operating Procedure for the Employee Suggestion Program ("Operating Procedure") and was established to "encourage and reward its employees for suggestions which improve the quality of service, reduce the cost of operations and maintenance, enhance productivity, increase revenue, and promote safety."   It is "an official forum for employees to submit suggestions to bring about improvements in these areas resulting in benefits to the company, its employees or its customers." Further, "[s]uggestions that meet certain criteria may be accepted for cash rewards."  In addition,

[a] suggestion is eligible for consideration in the Program only if it is an original suggestion, submitted in writing on an official suggestion form, is signed by the employee(s) and is received by the Suggestion Review Committee (Committee).  It must identify a specific problem or

16

improvement, describe a solution to the problem or means of implementing the improvement, and provide an estimate of the savings or other benefits to be realized.

The Operating Procedure further provides that the Suggestion Review Committee, "comprised of management and agreement employees representing a diverse number of MNR Departments" is "authorized to make final decisions on the acceptance, recognition and or award level appropriate to all suggestions."  Haw was not on the Committee, nor did he have any final decision making authority on any IDEAS suggestion.  (56.1 ¶ 122.)

Submitting an idea under the IDEAS program does not guarantee that it will be accepted. In 2014, there were a total of 60 suggestions received through the IDEAS Program. Of the 60 suggestions received, one suggestion that was returned to the employee, who submitted the suggestion, for additional details, and another suggestion is awaiting details from the Safety Department on whether there were employee injuries as claimed in the suggestion.   Of the remaining 58 suggestions, there were a total of five suggestions that were approved; three in 2014 and two in 2015.  The rest, including Wu's, were denied.  (56.1 ¶ 123-130.)

On or about January 23, 2014, the Corporate & Public Affairs Department ("CPAD") received a suggestion by Metro-North employee, Joseph Phillips, Assistant Director, Maintenance of Equipment Department, recommending that all data querying data be placed on all corporate personal computers and all corporate databases be available in a data mart for internal usage. On or about February 12, 2014, CPAD received another suggestion from Wu entitled "Create new database back-up that is smaller." Wu's suggestion, together with the suggestion from Phillips, was forwarded on February 12, 2014, by Meredith Conti, Corporate Relations Representative, CPAD, by email to Mezzanotte, who was asked to return the enclosed forms to Conti no later than March 14, 2014.  (56.1 ¶ 131.)

On March 13, 2014, Mezzanotte forwarded the request to Haw and informed him for the first time that the response to CPAD on the suggestions by Wu and Phillips was due the next day. He also asked Haw for assistance in evaluating the suggestions from a technical perspective and apologized for the late notice in forwarding them to him, explaining that it was lost in his "email flow." (56.1 ¶ 131.)  Haw evaluated both suggestions, and forwarded his analysis to Mezzanotte the next day. On or about March 17, 2014, Mezzanotte emailed the completed suggestion review forms for Wu and Phillips' suggestions back to Conti. (56.1 ¶ 132.)

Neither one of the IDEAS suggestions by Wu or Phillips were approved.  The completed suggestion review forms for Wu's suggestion showed that his suggestion did not offer any significant savings to Metro-North and did not properly safeguard Metro-North's data.  (56.1 ¶ 132.)  Also, his suggestion was not original, as a policy governing backup and recovery procedure was already established and being used at Metro-North. (56.1 ¶ 132.) Phillips' suggestion was determined to be unsupported because access to data is already provided to MNR business users where appropriate and the cost was too high and not justified. (56.1 ¶ 132.)

CAPD denied Wu and Phillips' suggestions on July 16, 2014.  (56.1 ¶ 133.) Phillips suggestion was submitted around a month earlier than Wu submitted his suggestion. (56.1 ¶ 131.) In May 2015, Wu appealed the denial of his IDEAS suggestion by letter to Sidney Gellineau, MTA CIO, and by email, dated July 2, 2015, Koehler denied the appeal.  (56.1 ¶ 134.)

Based upon the above, there is no merit to Wu's allegation that Metro-North delayed and denied his IDEAS suggestion on the basis of his age, and that claim must be dismissed.

C. Plaintiff Cannot Show that Metro-North's Reasons for its Actions are Unworthy of Credence.

Plaintiff cannot show that Metro-North's reasons for any of its actions were a pretext for age discrimination. First, with regard to their assessment of Wu's job performance, his supervisors

should be accorded deference and not second-guessed, especially since such assessments are supported by a wealth of documentation.  See, Soderberg v. Gunther Int'l, Inc., 124 Fed. Appx. 30 (2d Cir. 2005) (affirming summary judgment in favor of the defendant based on legitimate non-discriminatory reason for termination and quoting  Dister v. Cont'l Group, Inc., 859 F.2d 1108, 1116 (2d Cir. 1988), " 'it is not the function of a fact-finder to second-guess business decisions' regarding what constitutes satisfactory work performance.").

Wu's work assignments were no different from other DBAs, and he has failed to demonstrate any disparate treatment based on age.  In fact, on January 30, 2014, another DBA asked to assume one of Wu's assignments, even though she did not have training, because she believed it would provide her with additional skills, and therefore, the work previously assigned to Wu and which Wu complained about having been given, was reassigned to her.  (56.1¶ 86.)

D.  Plaintiff's Age-Related Hostile Work Environment Claim Fails.

Plaintiff's hostile work environment claim based on his age also fails because Wu cannot show that the workplace was "permeated with discriminatory intimidation, ridicule, and insult that [was] sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris v. Forklift Sys. Inc., 510 U.S. 17, 21 (1993) (citation and internal quotation marks omitted). See, Gibson v. Wyeth Pharmaceuticals, Inc., 2011 U.S. Dist. LEXIS 23935 (S.D.N.Y. 2011)(Defendant's motion for summary judgment granted where racial comment, being required to work overtime, three-day suspension and written warning were insufficient to demonstrate pervasive conditions constituting a hostile work environment.). See also, Almontaser v. New York City Dep't of Educ., 2014 U.S. Dist. LEXIS 92760 (E.D.N.Y. Jul. 8, 2014) (Teacher failed to state a claim for hostile work environment based on age where he alleged that the principal and assistant principal frequently told him "[y]ou're too old" and asked

when he was going to retire because the alleged remarks were not sufficiently severe.); <u>Colon-Reyes v. Fegs HHS Sys.</u>, 2015 U.S. Dist. LEXIS 32027 (Mar. 11, 2015) ("comments or questions about retirement, without more, do not create a hostile work environment.").  None of the actions alleged by Wu created a hostile work environment, but were actions designed to assist Wu to improve his performance, based on legitimate nondiscriminatory business reasons and were well within the purview of his supervisors.

Metro-North, as noted above, had legitimate nondiscriminatory reasons for its actions. Wu's ongoing performance problems and the union accretion required that Metro-North place Wu into a position for which he was qualified.  Metro-North had legitimate business reasons to take measures to ensure that Wu was performing his job as a DBA 4 based upon the union job description for such position and to warrant the salary he was being paid.  The memoranda and meetings with Wu and his supervisors were all designed to improve his performance and the other decisions relating to his employment were all based upon valid business reasons.

Based upon the foregoing, summary judgment should be granted, dismissing Plaintiff's ADEA discrimination claims, with prejudice.

### POINT II.

### SUMMARY JUDGMENT SHOULD BE GRANTED TO METRO-NORTH WITH RESPECT TO PLAINTIFF'S CLAIM OF RETALIATION UNDER THE ADEA

Metro-North is also entitled to summary judgment with regard to Plaintiff's age-related retaliation claims, because none of the actions complained of constitute adverse employment actions, as set forth above.  Moreover, the timing of Wu's complaints and the alleged adverse employment actions refute that there is any causal connection between his complaints and alleged actions.  It is well-documented that Plaintiff's performance problems began before he made any complaints about discrimination; management's efforts to remediate them have been ongoing since

2004.  (56.1 ¶ 4.)   In addition, the alleged actions took place before any of Wu's managers knew about Wu's complaints, thus also, establishing that there was no causation between Wu's complaints and the alleged actions which he says were taken by Metro-North.

In order to establish a *prima facie* case of age-based retaliation, a plaintiff must show that 1) he engaged in protected activity; 2) the employer was aware of this activity; 3) the employer took adverse action against the plaintiff; and 4) a causal connection exists between the protected activity and the adverse action. Wright v. Storch, Amini & Munves, P.C., 2014 U.S. Dist. LEXIS 58037 (S.D.N.Y. Apr. 25, 2014) citing Kessler v. Westchester County Dept. of Soc. Servs., 461 F.3d 199, 205-206 (2d Cir. 2006).  See also, Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 110 (2d Cir. 2010). "[P]rotected activity refers to action taken to protest or oppose statutorily prohibited discrimination." Cruz v. Coach Stores, Inc., 202 F.3d 560, 566 (2d Cir. 2000).  Even if a plaintiff establishes a *prima facie* case of retaliation, if the defendant identifies a legitimate, nondiscriminatory reason for the adverse employment action, the burden shifts back to the plaintiff to show that the proffered reason is a pretext for retaliation. Wright, *supra*, citing Hicks v. Baines, 593 F.3d 159, 160 (2d Cir. 2010).  As noted in Point I, supra, plaintiff has the burden of showing that any adverse employment action would not have occurred "but-for" the retaliation of the employer.

The basis for Wu's retaliation claims are complaints he allegedly filed on October 15, 2012, with the OIG, the Department of Labor, and the Department of Justice (56.1 ¶159), an internal complaint filed on July 25, 2013, with the Metro-North Office of Diversity and EEO (the "EEO Office"), claiming age and disability discrimination (56.1 ¶ 147),[3] an EEOC Charge, which he allegedly filed on October 30, 2013 (56.1 ¶ 157), and a March 14, 2014 complaint which he sent

---

[3]  This complaint was modified several times and the final version was sent to the EEO Office on August 9, 2013.

to Metro-North's President, Joseph Giulietti (the "March 2014 internal complaint").  (56.1 ¶ 160)
(collectively referred to as "the Complaints").

This Court has already found, in deciding Defendants' Motion to Dismiss, that Plaintiff
failed to allege that Haw was aware of the October 15, 2012 complaints, and dismissed Wu's claim
of retaliation against Haw on that basis.   Order, at 13. Wu does not allege that any other managers
who participated in decisions about his employment knew about these complaints and there is no
evidence in the record to support that they did.   Thus, there is no causation alleged or which can
be proved between these 2012 complaints and the alleged actions taken by Metro-North, and
therefore this claim should be dismissed.

Wu alleges that the retaliation commenced "[i]n the months after [he] described the
numerous incidents of age and disability discrimination that he had experienced over the last
several months while naming his supervisors as the culprits of such unlawful actions." (Amended
Complaint, ¶ 27.)  The only manager who is alleged to have taken any retaliatory action against
him is Haw.  His internal complaints and his EEOC Charge only make claims against Haw, and
the internal complaint, dated July 25, 2013, and the EEOC Charge were filed after the July 22
memo was issued to Wu by Haw.

Wu's retaliation claim is predicated upon alleged actions occurring after July 25, 2013.  He
specifically alleges the following acts constitute retaliation: 1) the denial of his request for a
modified work schedule to leave work one hour early five days a week (which his own medical
providers did not support), (id.), 2) the delay and denial of his IDEAS suggestion (id., ¶ 28), and
3) the requirement that he meet with Haw weekly after the July 22 memo (id., ¶ 29). He also alleges
that after he filed his EEOC Charge, on October 30, 2013, Haw assigned him an enormous project
without any aid and then removed the project, assigning it to a younger, disabled employee.  He

further alleges that after he filed his March 2014 internal complaint, he was denied overtime and required to work 38 consecutive hours.  (Id., ¶¶ 30-1.)  He additionally alleges that after he filed his complaints, Defendants disregarded his complaints about alleged use of illegal software.  (Id., ¶¶ 32-3.)

As set forth above, there is simply no merit to any of these allegations; in fact, they do not amount to adverse employment actions as a matter of law, as this Court has already found.  Wu still remains the highest paid DBA, and he was never demoted nor suffered any decrease in pay or responsibilities.  (56.1 ¶ 161.)

The timing of Wu's purported filing of various complaints and the alleged acts of retaliation also dispels any notion that there was a causal link between Wu's protected activity and the purported adverse employment actions, the latter of which, as noted previously, do not amount to, actionable conduct. See, Vlad-Berindan v. MTA New York City Transit, 2014 U.S. Dist. LEXIS 171289 (S.D.N.Y. Oct. 8, 2014) (where alleged protected activity occurred after the alleged adverse employment action, retaliation claim under the ADA is dismissed).  The Court in its decision on Defendants' Motion to Dismiss reaffirmed that in retaliation cases, a time span of two months between the protected activity and an adverse employment action to support an inference of causation must be "very close," and that the "district courts in this Circuit have consistently held that a passage of two months between the protected activity and the adverse employment action seems to be the dividing line."  Order, at 13-14, citing Walder v. White Plains Board of Educ., 738 F. Supp. 2d 483, 503 (S.D.N.Y. 2010) and quoting Ruhling v. Tribune Co., No. 04CV02430-ARL (E.D.N.Y. Jan. 3, 2007).  Most recently, the Eastern District of New York has recognized that "in the Second Circuit, district courts have consistently held that the passage of two or three months between the protected activity and the adverse employment action does not allow for an inference

of causation' to make a prima facie case." <u>Paul v. Postgraduate Ctr. for Mental Health</u>, 2015 U.S. Dist. LEXIS 42944 (E.D.N.Y. Mar. 31, 2015), citing <u>Hahn v. Bank of Am. Inc</u>., 2014 U.S. Dist. LEXIS 45886 (S.D.N.Y. March 31, 2014) (11 weeks between the complaint and termination is too long to establish causal connection), and <u>Murray v. Visiting Nursing Servs. of N.Y.</u>, 528 F. Supp. 2d 257 275 (S.D.N.Y. 2007).  Defendants became aware of Wu's complaints of age discrimination around July 25, 2013 when he filed his internal EEO complaint.  The actions which form the basis of Wu's claims of retaliation occurred either before the July 25, 2013 complaint was filed (the July 22, 2013 performance memo which required that Wu meet weekly with Haw), or more than five months or more after this internal complaint (i.e., the December, 2013 denial of Wu's request to leave early five days a week, and the March 2014 denial of the IDEAs Program submission the July 2014 denial of overtime,). As noted above, the claimed actions are not adverse employment actions as a matter of law, but even assuming that they were, no causal connection can be established because Metro-North denied Wu's request for a modified schedule on December 16, 2013, more than five months after the July 2013 complaint; Wu's IDEAS suggestion was processed by Haw in March 14, 2014, eight months after the complaint; Wu's IDEAS suggestion was denied by Metro-North on July 16, 2014, almost a year after the complaint; the alleged enormous projects were assigned to Wu on January 17 and 29, 2014, six months after the complaint; and the alleged disregard over his complaints relating to the use of unlicensed software asserted by Wu to have occurred in June and July 2014.  All of these actions occurred more than two months after Wu's July 25, 2013 complaint, and therefore there is no causal connection to this complaint and the alleged actions.  .

It is well-established that Wu's performance problems and management's attempt to address them date back to 2004.  (56.1 ¶ 4.)   Moreover, he was rated the lowest of all DBAs in

Metro-North, in January 2012, well before any of the Complaints were advanced. (56.1¶ 38.) Haw and Mezzanotte, who made decisions about Wu's employment, had no knowledge of the Complaints, when Haw provided Wu with the July 22 memo and instituted weekly meetings with Wu. (56.1 ¶ 55.) The July 22 memo, documenting Wu's performance problems and notifying him that he would be required to attend weekly meetings with his supervisor, predates the Complaints and could not could not possibly form the basis of retaliation.

In addition, in his Amended Complaint, Wu alleges that as a result of his October 30, 2013 EEOC Charge, efforts to retaliate against him further increased when he was denied a modified work schedule. His request for a modified work schedule occurred in October 2013 and was denied on December 16, 2013, and the EEOC complaint was not received by Metro-North until January 29, 2014. (56.1 ¶ 157.) Haw was not aware of the EEOC Charge until even later in February 2014. (56.1 ¶ 158.) Wu further alleges retaliation occurred based upon the EEOC Charge, when he was given so-called disproportionate work and unreasonable deadlines. However, the alleged unreasonable assignment was given to Wu on January 17, and 29, 2014. Haw could not have given these assignments to Wu as a retaliatory measure, because he was unaware of the EEOC Charge until February 2014, when he received it from Metro-North's Legal Department. (56.1 ¶ 83, 84, 158.) Moreover, Haw provided the alleged unreasonable deadline to Wu in error, and it was adjusted on January 30, 2014. (56.1 ¶ 85.)

As noted in Point I, even if the alleged delay and denial of Wu's IDEAS suggestion and overtime are adverse employment actions, there is no merit that these actions were taken because of retaliation. Legitimate business reasons formed the basis for the actions taken, not retaliation. The record shows that Haw did not delay the processing of Wu's IDEAS suggestion; he acted upon it in one day on March 13, 2014, as soon as Mezzanotte asked him to evaluate it. (56.1 ¶131, 132.)

25

He also evaluated another IT employee's IDEAS suggestion, submitted on January 23, 2014, before Wu's suggestion was submitted and recommended that it also be denied. CAPD, on July 16, 2014, denied both suggestions. (56.1 ¶132.)Wu's suggestion did not offer any cost savings and did not protect Metro-North's data.  (56.1 ¶132.)

With regard to overtime, Wu was denied overtime for legitimate nonretaliatory business reasons, because he failed to complete his assigned work on May 14, 2014 and on August 9-10, 2014.  (56.1 ¶137-140.) In fact, Wu had been denied overtime on another occasion by a different supervisor in 2011 for the same reasons, long before he filed any of the Complaints at issue.  (56.1 ¶136.)

Metro-North and Haw have demonstrated that all their actions related to Wu were based upon legitimate business decisions, unrelated to his age or his complaints of discrimination, as noted in Point I above.  "Where a 'business decision [is] made on a rational basis,' the ADEA does 'not authorize the courts to judge the wisdom of a corporation's business decisions.'" Wright v. Storch, Amini & Munves, P.C., 2014 U.S. Dist. LEXIS 58037 (S.D.N.Y. Apr. 25, 2014) quoting Parcinski v. Outlet Co., 673 F.2d 34, 37 (2d Cir. 1982).  Accordingly, Defendants should be granted summary judgment on Plaintiff's ADEA retaliation claim, because he has not shown that "but-for" Metro-North's retaliation, which is denied, he would not have been subject to the claimed actionable adverse employment actions.

## POINT III.

## SUMMARY JUDGMENT SHOULD BE GRANTED TO METRO-NORTH WITH RESPECT TO PLANTIFF'S CLAIM OF DISCRIMINATION UNDER THE ADA

Defendants are entitled to summary judgment on Plaintiff's claim under the ADA, because he is unable to meet his burden of establishing a *prima facie* case requiring him to show that 1) the employer is subject to the ADA; 2) he was disabled within the meaning of the ADA; 3) he was

26

otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and 4) he suffered an adverse employment action because of his disability. Brady v. Wal-Mart Stores, Inc., 531 F.3d 127, 134 (2d Cir. 2008).

A.   Plaintiff is Not Disabled under the ADA

Plaintiff fails to make out the first prong of his *prima facie* case, because he cannot show that he is disabled within the meaning of the ADA. ADA defines "disability" as 1) a physical or mental impairment that substantially limits one or more of the major life activities of an individual; 2) a record of such an impairment; or 3) being regarded as having such an impairment.  42 U.S.C.S. § 12102(1).  The major life activities that fall within the ambit of the ADA are "[c]aring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, sitting, reaching, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, interacting with others, and working." 29 C.F.R. § 1630.2(i)(1)(i).  Plaintiff has failed to present any evidence of a medical condition or any anecdotal evidence which supports a finding that he is a member of a protected class.

Plaintiff has failed to produce any medical evidence to show that he has a physical impairment that "substantially limits" a major life activity.  In fact, Wu testified that he had a problem with sleep apnea in 2008 and 2009, but that he started using a CPAP machine at night and from that time he was "more stable" and "not sleeping on the desk." (56.1 ¶ 115.) He further testified that his sleep apnea is under control. (56.1 ¶ 116.) When Plaintiff requested an accommodation to leave work one hour early it was not due to his sleep apnea but for physical therapy, based upon his back pain, and to see his psychologist.  (56.1 ¶ 117)  See, Morris v. Town of Islip, 2014 U.S. Dist. LEXIS 133168 (E.D.N.Y. Sept. 22, 2014)(Summary judgment granted in favor of employer where the employee failed to submit evidence that raised a genuine issue of fact

as to whether he suffered from a disability where the employee was able to perform alleged major life activities with little to no restriction and there was no medical evidence to the contrary). He never asked for an accommodation for his heart condition, nor has he demonstrated that this condition substantially limits a major life activity. Accordingly, Plaintiff has failed to show that he was disabled within the meaning of the ADA due to sleep apnea, his orthopedic problems or his heart condition.

Moreover, even if Plaintiff was able to demonstrate that these conditions render him disabled, which he cannot, Plaintiff did not suffer an adverse employment action because of such conditions. There is no evidence in the record to support that Plaintiff was disciplined as a result of any of these conditions. (56.1 ¶ 117.)   In fact, Haw stated that the July 22, memo had no relationship to any of Wu's medical conditions. (56.1 ¶ 54.)

B.  Plaintiff Cannot Show that He Suffered an Adverse Employment Action.

As noted in Point I above, none of Metro-North's alleged actions with regard to Plaintiff are adverse employment actions as a matter of law.

Metro-North Has Shown Legitimate Nondiscriminatory Reasons for its Actions

In addition, even if Plaintiff could establish that he is disabled within the meaning of the ADA, Metro-North had legitimate nondiscriminatory business reasons for its actions and Plaintiff cannot show that they were a pretext for disability discrimination.   As detailed above and in the accompanying declarations, Metro-North had legitimate nondiscriminatory business reasons for each of its actions, including those designed to improve Wu's performance problems. There is simply no connection between Wu's claimed disabilities and those actions.

The denial of Wu's request to leave work early five days per week was based on valid nondiscriminatory business reasons – the risk of not having adequate DBA coverage and the requested change in schedule was not supported by his own treating medical care providers. (56.1

28

¶ 107.)  Wu's own psychologist, Dr. Zhang, testified that he did not recommend that Wu leave work early every day and that he had weekend hours on Sunday.  Dr. Gao, Wu's physical therapist, confirmed he had an office in midtown New York City, where Wu worked.  Wu could attend physical therapy in that office, and therefore, he would not have to leave work early.  (56.1 ¶ 112.)

Moreover, there is no dispute that Metro-North provided Plaintiff with adequate family and medical leave to accommodate his various claimed ailments.  He testified at his deposition that he was approved for 480 hours of family and medical leave (56.1¶ 102), and he took family and medical leave time to attend physical therapy in Taiwan for his back, for several weeks in April and again, in November 2013.  (56.1 ¶ 102.)

C.   Plaintiff Cannot Show He Was Subjected to a Hostile Work Environment Because of Any Disability.

Plaintiff has also failed to establish that he was subjected to a hostile work environment on the basis of his disability. None of the actions allegedly taken against Wu rise to the level of creating a hostile work environment, as noted in Point I above, and therefore Defendants are entitled to summary judgment on this claim as well.  See, Spaulding v. New York City Dep't of Educ., 2015 U.S. Dist. LEXIS 126292 (E.D.N.Y. Sept. 21, 2015.)

In consideration of the foregoing, Plaintiff's ADA claim against Metro-North should be dismissed, with prejudice.

**POINT IV.**

**SUMMARY JUDGMENT SHOULD BE GRANTED WITH RESPECT TO PLANTIFF'S CLAIM OF RETALIATION UNDER THE ADA**

This Court should also dismiss Wu's retaliation claim under the ADA, and grant summary judgment to Metro-North.  The elements for a *prima facie* case of ADA retaliation are the same as those under the ADEA, that is – a plaintiff must allege that: 1) he was engaged in an activity

protected by the ADA, 2) the employer was aware of that activity, 3) an employment action adverse to the plaintiff occurred, and 4) there existed a causal connection between the protected activity and the adverse employment action. Widomski v. State Univ. of New York (SUNY) at Orange, 748 F. 3d 471, 476 (2d Cir. 2014); Mazur v. N.Y. City Dept. of Educ., *supra*, at 53 F. Supp. 3d at 637. Once the plaintiff has established a *prima facie* case, the burden shifts to the employer to rebut the presumption of discrimination by articulating a legitimate nondiscriminatory reason for the adverse employment action. Bickerstaff v. Vassar Coll., 196 F.3d 435, 446 (2d Cir. 1999)(citations omitted). Once the employer meets this burden, the question then becomes whether the plaintiff can prove that the employer's proffered reason was pretextual. See, Bickerstaff, 196 F.3d at 446. "Although the evidentiary burdens shift back and forth under this framework, 'the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000) (quoting Tex. Dep't of Cmty Affairs v. Burdine, 450 U.S. at 248, 253 (1981)). In a retaliation claim under the ADA, the plaintiff must demonstrate that the adverse employment action would not have occurred "but-for" the retaliation of the employer. See, Nassar, supra.

The factual basis for Plaintiff's ADEA and ADA claims are indistinguishable. Once again, Plaintiff has failed to make out a *prima facie* case of ADA retaliation, because he has failed to demonstrate that he was subject to an adverse employment action in response to his disability discrimination complaints, which he first advanced on July 25, 2013. Plaintiff alleges that Defendants "drastically increased his workload, subjected him to disparate working conditions, fostered a hostile work environment and failed to remedy the disability discrimination harassment." (Complaint ¶ 16.) As noted previously, these actions do not constitute adverse

employment actions, because Wu was never demoted or had any loss in pay, and in fact, continues to remain in his same position as a DBA 4 earning the highest salary of all of other DBAs.  (56.1¶ 160-162.) Additionally, even if the alleged actions resulted in a tangible loss to Wu, there is no causal connection between the actions taken by Metro-North and the disability discrimination complaints he has asserted, especially considering the temporal proximity between his complaints and the alleged actions taken. All decisions were made based upon legitimate business reasons having no relationship whatsoever to any disability.  In consideration of the foregoing, Plaintiff's ADA retaliation claims should be dismissed, with prejudice because he has not shown that but-for Metro-North's retaliation, which is denied, he would not have been subject to the alleged actionable adverse employment actions.

## POINT V.

### HAW'S MOTION FOR SUMMARY JUDGMENT SEEKING DISMISSAL OF PLAINTIFF'S FIRST AMENDMENT CLAIM SHOULD BE GRANTED

This Court granted Haw's Motion to Dismiss all the constitutional claims against him, except for Wu's limited claim that Haw subjected him to retaliation because of Wu's EEOC Charge, by allegedly delaying submission of and denying Wu's suggestion under Metro-North's IDEAS Program. In doing so, the Court based its determination on a finding that Wu's Amended Complaint sufficiently stated a claim for First Amendment retaliation, based on these narrow facts, to allow him to proceed with his claim.  On summary judgment, Wu's First Amendment retaliation claim should be dismissed, because he cannot demonstrate that he suffered an adverse employment action or that a causal connection exists between his speech and that, or any other alleged, adverse employment action.  To establish a claim for First Amendment retaliation, a plaintiff must plead and prove that: "(1) his speech addressed a matter of public concern, (2) he suffered an adverse employment action, and (3) a causal connection exists between his speech and the adverse

employment decision, so that it can be said that the plaintiff's speech was a motivating factor in the adverse employment action." Agard v. N.Y. State Dep't of Taxation & Fin., 2012 U.S. Dist. LEXIS 34614 (E.D.N.Y. Feb. 23, 2012), citing Cioffi v. Averill Park Cent. Sch. Dist. Bd. Of Educ., 444 F.3d 158, 162 (2d Cir. 2006). The Northern District of New York has held that the "legal framework for First Amendment retaliation claims brought under § 1983 is virtually identical to the McDonnell Douglas burden-shifting analysis used for Title VII retaliation claims," Dotson v. City of Syracuse, 2009 U.S. Dist. LEXIS 62174 (N.D.N.Y. Jul. 21, 2009), Consequently, under Nassar, the plaintiff is required to demonstrated, that but-for the alleged retaliation, he would not have been subject to the actionable adverse employment actions.

This Court found that the only facially cognizable adverse employment action claimed by Wu against Haw under the First Amendment was the alleged delay by Haw in processing and denying Wu's IDEAS suggestion which purportedly caused Wu to lose "thousands of dollars" and "professional benefits." This claim has no merit and should be dismissed.

Wu cannot establish that Haw delayed his suggestion under the IDEAS Program, that any such delay by Haw caused him to lose "thousands of dollars" and "professional benefits," and that it was related in any way to Wu's EEOC Charge. Thus, Wu's First Amendment retaliation claim should be dismissed.

Haw did not even know about Wu's IDEAS suggestion until March 13, 2014, when Mezzanotte forwarded the request to him and informed him for the first time that the response to CPAD on the suggestions by Wu and Phillips was due the next day. Mezzanotte asked Haw for assistance in evaluating the suggestions from a technical perspective and apologized for the late notice in forwarding them to him and explained that it was lost in his "email flow." (56.1 ¶ 131.)

Haw immediately acted to evaluate Wu's IDEAS suggestion and Phillips' as well.  Haw at the request of Mezzanotte evaluated both suggestions, recommended that they both be denied, and after he forwarded his analyses to Mezzanotte on or about March 14, 2014, Haw had no further involvement in the processing of these suggestions.   On or about March 17, 2014, Mezzanotte emailed the completed suggestion review forms for Wu's suggestion and Phillips' suggestion back to Conti.  (56.1 ¶ 132.)

As noted above, in Point I, supra, neither one of the IDEAS suggestions by Wu or Phillips were approved, based upon valid nonretaliatory business justifications.   In addition, Wu's suggestion was handled entirely by CPAD after March 17, 2014, without Haw's involvement. Metro-North denied approval of Wu's suggestion in a letter, dated July 16, 2014, because it did not offer any significant savings to Metro-North and did not properly safeguard Metro-North's data.  (56.1 ¶ 133.)   CPAD also denied the suggestion by Phillips, which was actually submitted around a month earlier than Wu submitted his suggestion.  (56.1 ¶ 133.)

Wu, in May 2015, appealed the denial of his IDEAS suggestion by letter to Gellineau, and by email, dated July 2, 2015, Koehler, who had been assigned to review the suggestion again, reaffirmed its denial.  (56.1 ¶ 134.)  Haw had nothing to do with the appeal. (56.1 ¶ 134.)

In addition, there is no guarantee that a suggestion submitted to the IDEAs Program will be accepted.  In fact, the vast majority of suggestions are denied.  Specifically, in 2014, of 60 suggestions submitted under the Program, only five received awards which ranged from $100 to less than $600.  Wu has not submitted any evidence to show that he suffered any damages based upon the denial of his IDEA suggestion. This is fatal to his burden of proof.  See, Sethi v. Narold, 12 F. Supp. 3d 505 (E.D.N.Y 2014) (failure to demonstrate adverse employment action where

plaintiff fails to show he was entitled to benefit and rebut that employer was enforcing a generally applicable policy against him).

In addition, as set forth above, this Court has recognized that no causal connection exists where as here a time span of more than two months from the filing of Wu's complaints and the alleged adverse employment action occurs.  Order at 14.  Based upon this authority, the Court dismissed Wu's complaint of constitutionally based retaliation stemming from his October 15, 2012 complaints, because Wu alleged that Haw did not take any negative action against him until at least May 9, 2013, around seven months later.  Wu's IDEAS suggestion was denied on July 16, 2014 by Metro-North, almost two years after Wu's alleged first complaint of discrimination, around a year after his July 25, 2013 internal complaint and nine months after October 2013, when Wu allegedly filed his EEOC Charge.  These facts dispel any notion that there is sufficient temporal proximity to make out a claim of retaliation against Haw based upon the denial of Wu's IDEAS suggestion. Certainly, there is no temporal proximity to Wu's complaints and the July 2, 2015 denial of Wu's appeal over the decision on his suggestion. Moreover, as noted previously, there is no evidence that Haw delayed the processing of Wu's suggestion.  Finally, Haw did not have final authority in denying the suggestion and he had no involvement in the denial of Wu's appeal of the decision.

Based upon the foregoing, Wu's First Amendment retaliation claim against Haw has no merit and should be dismissed.

## **CONCLUSION**

For the reasons set forth above, summary judgment should be granted in favor of Defendants and the Amended Complaint should be dismissed in its entirety, with prejudice.

Respectfully submitted,

WONG FLEMING
*Attorneys for Defendants*
*Metro-North Commuter Railroad Company*
*d/b/a MTA Metro-North Railroad and Jim*
*Haw*

Dated: October 9, 2015

By: */s/ Linda Wong*
Linda Wong, Esq.
300 East 42nd Street, 14th Floor
New York, NY 10017
Tel. (212) 643-9668
Fax (212) 643-9640
E-mail: lwong@wongfleming.com