UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

TONY WU,

                      Plaintiff,

                                                 No. 14CV7015-LTS-FM

       -against-

METRO-NORTH COMMUTER RAILROAD
COMMUTER RAILROAD COMPANY d/b/a
METRO-NORTH RAILROAD & JIM HAW,

                      Defendants.

------------------------------------------------------------x

<u>M</u>EMORANDUM <u>O</u>PINION AND <u>O</u>RDER

        Plaintiff Tony Wu ("Wu" or "Plaintiff") brings this action against Defendants

Metro-North Commuter Railroad Company ("Metro-North") and Jim Haw ("Haw" and,

collectively, "Defendants"), seeking declaratory relief, equitable relief and damages for alleged

violations of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 <u>et</u> <u>seq.</u>;

the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 623 <u>et</u> <u>seq.</u>; the

Equal Protection Clause of the Fourteenth Amendment to the United States Constitution; and the

free speech provision of the First Amendment to the United States Constitution.[1]  Defendants

---

[1]    Defendants previously moved, pursuant to Federal Rule of Civil Procedure 12(b)(6), for dismissal of certain of Wu's claims against Haw for failure to state a claim upon which relief can be granted.  (<u>See</u> Docket Entry No. 31.)  On September 22, 2015, this Court issued a Memorandum Opinion and Order dismissing Wu's Fifth Cause of Action asserting a Fourteenth Amendment Equal Protection Claim against Haw.  The Court also granted in part Defendants' motion to dismiss Wu's Sixth Cause of Action, insofar as it sought dismissal of Wu's First Amendment retaliation claim based on complaints filed by Wu on October 15, 2015, July 25, 2013 and March 14, 2014.  (<u>See</u> Docket Entry No. 87.) Accordingly, those claims are not addressed here.  Moreover, Wu has failed to submit any argument in opposition to Defendants' motion for summary judgment

now move for summary judgment, pursuant to Federal Rule of Civil Procedure 56(a), seeking

dismissal of all of Wu's claims.  Defendants also move, pursuant to Federal Rule of Federal

Procedure 37(c)(1), to strike the declarations of Jack Sim, Bradley Liu, Shaoming Chang and

Pamela Sokolosky – which have been proffered by Plaintiff in connection with the instant

summary judgment motion – as well as for attorneys' fees and costs on the motion to strike.

(Docket Entry No. 146.)  The Court has jurisdiction of this case pursuant to 28 U.S.C. § 1331.

The Court has carefully considered the parties' submissions.  For the reasons

stated below, the Court grants both of Defendants' motions.


BACKGROUND[2]

Plaintiff Tony Wu commenced his employment with Metro-North as a Database

Administrator ("DBA") in Metro-North's Information Technology ("IT") Department in

September 2001.  (Def. 56.1 St. ¶ 1.)  Wu is a sixty-five year old man who has worked as a

---

with respect to his remaining First Amendment claim against Defendant Haw.
Accordingly, the Court deems that claim abandoned and grants Defendant's
motion for summary judgment insofar as it seeks dismissal of any remaining First
Amendment claim against Haw.

[2]     The facts recited herein are undisputed unless otherwise indicated.  Facts recited
as undisputed are identified as such in the parties' statements pursuant to
S.D.N.Y. Local Civil Rule 56.1 or drawn from evidence as to which there is no
non-conclusory contrary factual proffer.  Citations to the parties' respective Local
Civil Rule 56.1 Statements ("Def. 56.1 St." or "Pl. 56.1 St.") incorporate by
reference the parties' citations to underlying evidentiary submissions.  Plaintiff
responds to several of Defendants' proffers by indicating that "Plaintiffs object
[sic] to this paragraph as it does not contain a 'short and concise statement' as
Local Rule 56.1 requires and because the statements are unduly confusing or
prejudicial under Federal Rule of Evidence 403."  (See, e.g., Pl. 56.1 St. ¶ 125.)
These boilerplate objections, which lack citations to otherwise admissible
evidence, are plainly insufficient to controvert Defendants' proffered facts, which
are bolstered by evidentiary support.  See S.D.N.Y. Local Civil Rule 56.1(d).

Metro-North DBA for more than 13 years.  (<u>See</u> Docket Entry No. 24, Amended Complaint ¶¶ 11-12; Declaration of Melanie Lazarus in Opposition to Defendants' Motion for Summary Judgment ("Lazarus Dec.") Ex. B, Declaration of Tony Wu ("Wu Dec.") ¶¶ 1-2.)  From 2001 through June 2013, Wu was a DBA Level F; as such, he worked to support the Metro-North database across platforms.  (Def. 56.1 St. ¶ 2.)  On June 5, 2013, Wu was placed into a DBA Level 4 ("DBA 4") position as a result of the accretion of all DBA's at Metro-North into the Transportation Communications International Union ("TCU").  (<u>Id.</u> ¶ 3.)  Wu currently holds a DBA 4 position.  (<u>Id.</u>)  Defendants assert, and Plaintiff contests, that Wu has exhibited performance problems throughout his career at Metro-North, many of which have been documented by his managers over the years.  (<u>Id.</u> ¶ 4.)[3]

*Wu's Performance*

Defendant Haw is currently employed as the Director of Transportation Applications (Revenue) at the Metropolitan Transportation Authority ("MTA"), which is the parent agency of Metro-North.  (<u>Id.</u> ¶ 5.)  Haw was employed at Metro-North from 1995 through January 2015 and held several positions.  At various points throughout that period, Haw supervised Plaintiff, who reported directly to him.  (<u>Id.</u> ¶¶ 5-6.)  Haw also supervised individuals who directly supervised Wu, including Suresh Konappanavar ("Konappanavar"), who identified certain of Wu's performance problems.  (<u>Id.</u> ¶ 7.)  For example, in an evaluation of Wu's performance for the calendar year 2004, Konappanavar noted that Wu "needs to take more time to fully understand [his] expectations on assigned tasks," and noted that Wu "needs to fully understand what is expected on each task, so that his work does not require this level of review

---

[3]     Wu alleges that he consistently met expectations and that his performance reviews were "overwhelmingly positive."  (Pl. 56.1 St. ¶ 4.)

frequently." (Def. 56.1 St. ¶ 8.)  In a mid-year performance review from 2005, Konappanavar documented a meeting that he held with Wu on May 18, 2005, at which he discussed several deficiencies in Wu's performance.  (Id. ¶ 9.) In Wu's evaluation for the year 2005, Konappanavar again noted that Wu needed to take more time to understand expectations on assigned tasks and to "improve his ability to receive from the rest of the team."  (Id. ¶ 10.)  In a 2006 mid-year performance evaluation, Konappanavar noted that Wu had begun to challenge Konappanavar's requests on several issues, including scheduling and task completion.  (Id. ¶ 14.)[4]  In July 2007, Wu provided faulty information to a server administration team, which necessitated the intervention of an assistant director of database administration and disaster recovery and forced Konappanavar to stay late to fix the problem.  (Id. ¶ 17.)  The following day, Wu sent an apologetic email to Konappanavar, who later met with Wu to discuss the problem.  (Id.)  In Wu's performance evaluation for the 2007 calendar year, Konappanavar noted that Wu needed to "concentrate more on the work and understand the importance of some of the critical tasks and my expectations."  (Id. ¶ 18.)

In or around 2008, Wu began reporting to Jim Robinson ("Robinson") who, in turn, reported directly to Haw.  (Id. ¶ 19.)  In Wu's 2008 performance evaluation, Robinson noted that Wu needed "to concentrate more on the work and understand the importance of the some [sic] of the critical tasks and my expectations."  (Id. ¶ 20.)  Robinson also noted that Wu needed to demonstrate "more leadership" and that Wu often would "come[] to [him] without analyzing the situation."  (Id.)  After one particular error in May 2009, Robinson drafted an email in which he stated "I have counseled Tony on many occasions regarding details . . . Since

---

[4]     While Wu disputes Defendants' characterization of these evaluations, it is undisputed that the evaluations contain criticisms and concerns relevant to Wu's performance.  (See Pl. 56.1 St. ¶¶ 7-8.)

repeated verbal attempts have failed to get Tony to handle items such as this, I am documenting same in writing."  (Def. 56.1 St. ¶ 21.)

In the spring of 2010, Metro-North's IT Department experienced a reduction in force.  (Id. ¶ 22.)  Metro-North was directed to reduce its management payroll by 15% and, in an effort to do so, all management employees – including Wu – were offered the opportunity to retire with certain incentives.  (Id.)  After several employees took advantage of the package and left Metro-North, involuntary terminations were required to reach the 15% payroll reduction goal.  (Id. ¶ 23.)  The Metro-North IT Department decided that it could reduce the DBA staff by one position and, because Wu was the lowest performing DBA in the group and his work could most easily be absorbed by others, Wu was identified by Haw as the DBA who would be terminated.  (Id.)[5]  In the end, the DBA group was not affected by the reduction in force.  (Id.)  Wu was not then, and has not since been, laid off.  (Id. ¶¶ 23, 162.)

Haw likewise observed problems with Wu's performance.  On October 2, 2006, Wu failed to troubleshoot a change in database activity, prompting Haw to send Wu a critical email, asking him to be "more attentive to this these [sic] type of changes in the future."  (Id. ¶ 11.)[6]  In November 2006, Haw learned that Wu had run an update – a primary DBA responsibility – incorrectly, prompting Haw to send an email documenting the error.  (Id. ¶ 13.)  Haw also completed Wu's performance evaluation for the calendar year 2011.  In that review,

---

[5] Wu disputes that Haw selected him for termination on the basis of his performance, arguing instead that he was selected because his job could be absorbed by other employees.  (Pl. 56.1 St. ¶ 23.)  Wu, does not, however, dispute the contentions that he was the lowest performing DBA, nor that he was identified by Haw for termination.  (Id.)

[6] Wu disputes Defendants' characterization of this email, but does not dispute its existence nor its underlying critical nature.  (Pl. 56.1 St. ¶ 11.)

Haw noted that, while Wu met expectations, his "[q]uality of work is an area of concern.  On more complex task/project [sic] Tony's work needs to be reviewed."  (Def. 56.1 St. ¶ 26.)

In June of 2012, the National Mediation Board ruled that Metro-North's IT employees were entitled to join the TCU.  (Id. ¶ 31.)  The accretion included DBA positions which, before the accretion, were management positions and not represented by a union.  (Id.)  A number of changes to the responsibilities and working conditions of the IT employees occurred as a result of the accretion.  (Id. ¶ 33.)  Around the time of the accretion, affected employees, who were formerly management employees, were given the option to retire with free lifetime medical benefits.  (Id. ¶ 34.)  These employees would no longer be entitled to such benefits if they chose to retire from Metro-North as union-represented employees.  (Id.)  The accretion involved and affected all IT employees in positions accreted to the union, including DBAs.  (Id. ¶ 35.)[7]  A review of the DBA group was conducted to determine proper placement of each employee and it was determined that, while Wu had the lowest rated job performance of all of the DBAs, he had the highest salary.  (Id. ¶¶ 38-39.)[8]  In or around late April or May 2013, Haw met with Wu to discuss his placement.  (Id. ¶ 41.)  At this meeting, Haw explained to Wu that, in making his decision on retirement, it was important for him to remain aware of deadlines.  (Id.)  Between March and April 2013, Wu and other DBAs expressed their concerns to Haw and other managers about their potential loss of lifetime benefits upon accretion.  (Id. ¶ 43.)

Sometime in the Spring of 2013, Wu and Haw had a meeting at which Wu's decision on retirement was discussed.  (Id. ¶ 44.)  Defendants contend that, at this meeting, Haw

---

[7]     Wu claims, in conclusory fashion, that the accretion affected him "more seriously" than other employees.  (Pl. 56.1 St. ¶ 35.)

[8]     Metro-North paid Wu a salary commensurate with a DBA 5, despite the fact that he was performing work as a DBA 4.  (Def. 56.1 St. ¶ 161.)

"expressed his personal opinion that Wu had to decide whether lifetime medical benefits were important enough for him to retire then or not, and they talked about the criteria of how someone would make that decision."  (Def. 56.1 St. ¶ 44.)  Defendants also claim that Wu solicited Haw's advice on what to do and that Haw told Wu, "Tony, if it was that important to me and I could do it financially, I would retire, but you have to make that decision."  (Id.)  Wu claims that he never sought Haw's opinion and that Haw offered his advice unsolicited, while referring to Wu's age and disabilities.  (See Pl. 56.1 St. ¶ 44.)  Wu further claims that, at a second meeting, Haw once again suggested that Wu should retire due to his age and disability[9] status.  (Id.)  According to Wu, when he told Haw that he would not be able to retire due to his financial situation, Haw became angry.  (Id.)  Defendants contend that Haw never told Wu that he should retire, nor that it would be in his best interests to do so.  (Def. 56.1 St. ¶ 45.)

During the Spring and Summer of 2013, Haw identified "serious performance deficiencies" in Wu's understanding of his work and his ability to capably handle his responsibilities.  (Id. ¶ 46.)  For example, on June 23, 2013, Wu asked Rasheed Sonson, a server administrator, to start a database for him, although the starting and stopping of databases was Wu's responsibility.  (Id. ¶ 48.)[10]  After a meeting with all of the DBAs on June 27, 2013, Haw spoke privately with Wu to address some performance problems that he had observed.  The conversation ended with Wu advising Haw, "no problem, it won't happen again."  (Id. ¶ 50.)  The parties dispute whether Wu exhibited basic competency with respect to certain tasks that a DBA 4 should have been able to perform.  (See id. ¶¶ 51-53; Pl. 56.1 St. ¶¶ 51-53.)  Based on

---

[9]     Wu's health conditions are discussed infra.

[10]    Wu claims that it was within his authority as a DBA to instruct the server administrator to start the database.  (Pl. 56.1 St. ¶ 48.)

these perceived problems, Haw consulted with Vincent Mezzanote ("Mezzanote") and Metro-North labor relations and decided to provide Wu with a memorandum setting forth his deficiencies (the "July 22 Memo"), and to meet with him periodically to discuss his projects and monitor his improvement.  (Def. 56.1 St. ¶ 54.)  The memorandum had been reviewed and approved by Mezzanotte and labor relations prior to the meeting.  (Id.)  At the time the memo was drafted and presented to Wu, Haw had no knowledge of a complaint filed by Wu with the MTA Office of Inspector General in October 2012, wherein Wu objected to the loss of medical benefits following union accretion.  (Def. 56.1 St. ¶ 55.)

At their meeting regarding the July 22 Memo, Haw provided Wu with examples of his supposedly deficient performance, and advised Wu that they would meet weekly to discuss projects that they were working on together in an effort to improve his performance.  (Id. ¶ 56.)  Thereafter, Haw and Wu met approximately once a week to discuss Wu's progress.  (Id. ¶ 58.)  Defendants represent that the meetings were largely unproductive and that, at a meeting on July 25, 2013, Wu placed a medicine bottle on Haw's desk and began to cry, and told Haw he should back off or fire him.  (Id.)

On September 6, 2013, Haw wrote an email to Mezzanotte, attaching notes from his most recent meeting with Wu and advising him, "[A]t this point, Tony is not willing to engage in a discussion.  When I mention a specific item, he says that 'If that is what you want to use to kick me out, OK.'"  (Id. ¶ 60.)  Haw also requested that the new director of infrastructure, information technology, Michael La Chapelle ("La Chapelle") begin sitting in on his meetings with Wu.  (Id.)  Defendants contend that, even after the July 22 Memo was presented to Wu, his performance problems persisted.  (Id. ¶¶ 62-69.)[11]  Wu also purportedly regularly engaged in

_____

[11]     Wu takes issue with this characterization of his work.  (See Pl. 56.1 St. ¶¶ 62-69.)

unprofessional, uncooperative and rude behavior, which included sending several emails that were perceived as insubordinate.  (Def. 56.1 St. ¶¶ 71-72.)  These cumulative problems led Mezzanotte, La Chapelle and Haw to discuss disqualifying Wu from his position as a DBA 4.  (Id. ¶ 73.)  In November 2013, La Chapelle sent a memorandum to Mezzanotte outlining several of Wu's performance shortcomings and recommending that he be demoted or disqualified.  (Id. ¶ 74.)  Furthermore, in an email dated November 12, 2013, Mezzanotte advised La Chapelle and Haw that, from his perspective, "Tony needs to be disqualified immediately based on his attitude and inability to meet the demands of the DBA Level 4 position.  He is also contributing to a hostile work environment . . . ."  (Id. ¶ 76.)  A draft memorandum prepared for Wu stated that he "not only [fell] short of the requirements of the Database Administrator Level 4 position but also [did] not understand the responsibilities of the position."  (Id. ¶ 77.)  Moreover, a memorandum from La Chapelle to Wu, dated December 2, 2013, stated that Wu "continue[d] to not meet [his] goals and demonstrate behavior to the contrary [sic] to working cooperatively as part of the team."  (Id. ¶ 80.)  To date, Wu has not been disqualified or demoted, nor has he suffered a reduction in his salary or a diminishment of his responsibilities.  (Id. ¶¶ 81, 162-63.)

On January 29, 2014, all Metro-North DBAs were provided with a memorandum from Haw, assigning them a list of projects.  (Id. ¶ 84.)  Wu was assigned to provide support for the Oracle Real Application Clusters database environment.  (Id.)  He objected to the assignment, however, claiming that he had not received appropriate training, and complained that the time frame set for completion of the project was unreasonable.  (Id. ¶¶ 84-85.)  Following Wu's complaint about the timing of the project, Haw realized that he had mistakenly set an incorrect due date for the project and corrected it.  (Id. ¶ 85.)  Another DBA 4, Christine Xia, volunteered to handle the support assignment, despite the fact that she had not received the

training that Wu claimed he needed, indicating that she wished to learn the technologies

required.  (Def. 56.1 St. ¶ 86.)  As a result, the project was assigned to Xia.  (Id.)

Beginning in the Spring of 2014, Haw began shifting his supervision of the DBAs

to K.C. Stubbs ("Stubbs").  Defendants contend that Wu continued to display that he was unfit

for his position and to act in an insubordinate fashion, characterizations that Wu contests.  (Id.

¶¶ 89-95; Pl. 56.1 St. ¶ 95.)  Defendants also represent that Wu repeatedly questioned and

challenged his assignments, and claim that on numerous occasions he sent rude and

insubordinate emails about these assignments to a wide group of Metro-North employees, most

of whom had no involvement in his day-to-day supervision.  (Def. 56.1 St. ¶ 96-97, 99.)[12]  On

August 13, 2014, Stubbs authorized overtime for Wu, but instructed him not to schedule or work

overtime in the future, because he had been unable to successfully complete maintenance

assignments twice in the preceding few months.  (Id. ¶ 98.)

*May 2014 Denial of Overtime*

In May 2014, Wu was denied overtime when he was unable to resolve a trouble

call.  (Id. ¶ 137.)  Wu notes that he worked 37 minutes in the middle of the night without

receiving any pay.  (Pl. 56.1 St. ¶ 137.)  On May 28, 2014, Haw recommended that Wu's claim

for overtime work be denied because Wu was unable to resolve the call, and another employee

thereafter resolved the problem remotely in a short period of time.  (Def. 56.1 ¶ 138.)[13]

Mezzanotte agreed with Haw's decision to deny Wu overtime.  (Id. ¶ 139.)  Mezzanotte also

---

[12]     Wu disputes the characterization of these emails as "rude."  (Pl. 56.1 St. ¶¶ 96-97, 99.)

[13]     Wu disputes that he was unable to resolve the trouble call as a result of inability or unpreparedness, claiming instead that he had trouble logging in remotely.  (See Pl. 56.1 St. ¶ 138.)  He does not, however, contest that he was ultimately unable to resolve the call, nor that another employee was able to do so quickly.  (See id.)

instructed Wu that, if he disagreed with the denial, he should contact his union representative.
(Def. 56.1 ¶ 139.)  On June 26, 2014, Wu filed a formal grievance through the TCU, which was
denied in July 2014, based on the fact that he had been unable to resolve the trouble call.  (Id.
¶ 140.)

On or about June 15, 2014, Wu worked 38 hours of overtime performing a
database upgrade.  (Id. ¶ 142.)  Despite his inability to complete the task, Wu was still paid
overtime.  (Id.)

*Wu's Health Problems*

In 2013, Wu was approved for 480 hours of family and medical leave to attend
doctors' appointments in the New York area, as well as to travel to Taiwan for physical therapy.
(Id. ¶ 102.)  In or around October 2013, Wu asked for a change in his work schedule allowing
him to come in and to leave earlier in the day once a week.  (Id. ¶ 103.)  In October 2013, Gary
Martens, Human Resources Manager for Testing and Assessment ("Martens") became aware
that Wu had made a request for a change in his work hours.  (Def. 56.1 St. ¶ 104.)  Wu requested
that Martens send him forms related to reasonable accommodation requests, which Martens
emailed immediately.  (Id.)  Plaintiff asserts that he requested to change his work hours five days
a week.  (Pl. 56.1 St. ¶ 103.)[14]  Martens consulted with Haw and La Chapelle regarding Wu's
request and whether the IT Department could accommodate Wu leaving early twice a week.
(Def. 56.1 St. ¶ 107.)  Defendants ultimately determined that there was a business risk associated
with not having adequate DBA coverage during the evening rush hour and that, in light of this

---

[14]    Wu further claims that he was eventually informed that the best Metro-North
could offer was an accommodation permitting him to leave early one day per
week, plus one flexible early day per week, and that he accepted this arrangement
grudgingly.  (Pl. 56.1 St. ¶ 103.)  Wu also asserts that Defendants never attempted
to have anyone trade shifts with him in order to accommodate his request.  (Id.)

risk, the IT Department could only accommodate Wu's departure from work one day a week and, if needed, up to two days a week.  (Def. 56.1 St. ¶ 107.)

As part of the evaluation process under Metro-North's ADA policy, Martens asked Wu to provide medical documentation to support his accommodation request.  (Id. ¶ 109.) Wu provided a note from Dr. Xiao-Ke Gao, his neurologist, stating that he needed physical therapy with acupuncture one to two times a week.  (Id. ¶ 110.) Wu also provided Martens with a note from Dr. Yuanxia Zhang, his psychologist, stating that Wu had been a patient of his since July 26, 2013, and that Wu needed to leave work at 4:00 p.m. rather than 5:00 p.m. one to two times per week.  (Id. ¶ 111.)  Zhang also told the physicians in Metro-North's Occupational Health Services ("OHS") office that Wu only needed to see him once a week, or up to two times a week as needed.  (Id. ¶ 112.)  The OHS office was also informed that Dr. Gao had office hours in his midtown New York office until 7:00 p.m. Tuesday through Friday, obviating Wu's need to leave work early to receive treatment.  (Id.)  Dr. Zhang revealed in his deposition that he had Sunday hours that were available to Wu for his counseling appointments.  (Id. ¶ 113.)

On December 16, 2013, Martens advised Wu in writing that Metro-North had approved his request to change his work schedule to leave work early one pre-determined day per week to meet with Zhang, and another flexible day as needed.  (Id. ¶ 114.)  Haw, who did not play a role in making the final decision, learned of the accommodation around that time.  (Id.)[15]

*Wu's Software Complaint*

In or about April 2014, Wu requested Reflection X Windows software in order to

---

[15]     While Wu "disputes that Haw was not involved in the decision," his response is not responsive to Defendants' statement of facts, which notes that the ultimate determination with respect to Wu's accommodation request was not made by Haw personally.  (Pl. 56.1 St. ¶ 114; Def. 56.1 St. ¶ 114.)

perform a task that was assigned to him.  (Def. 56.1 St. ¶ 119.)  Wu raised an issue about

whether the software was properly licensed to Metro-North.  (Id.)  Metro-North looked into the

matter and determined that the software was covered by an MTA-wide license that applied to

Metro-North.  (Id.)[16]  David Koehler, Chief of Transportation Applications, received several

emails from Wu between June 26 and 30, 2014, concerning the software.  (Id. ¶ 120.)  On July 1,

2014, Koehler met with Wu and explained that he was in error concerning the software, as

Metro-North had an appropriate license.  (Id.)  That same day, Wu sent Koehler an email that

Koehler regarded as insubordinate.  (Id.)

                    *Wu's IDEAS Submission*

          The IDEAS Program was established by Metro-North to "encourage and reward

its employees for suggestions which improve the quality of service, reduce the cost of operations

and maintenance, enhance productivity, increase revenue, and promote safety."  (Id. ¶ 122.)  The

program allows employees to "submit suggestions to bring about improvements . . . resulting in

benefits to the company, its employees or its customers."  (Id.)  Suggestions must be original,

submitted in writing on an official form, signed by the employee and received by the suggestion

review committee.  (Id.)  They must also identify a specific problem or improvement to be made,

describe a solution or means of implementing the improvement, and provide an estimate of the

savings or other benefits to be realized.  (Id.)  "Suggestions that meet certain criteria may be

accepted for cash rewards."  (Id.)  Only a small percentage of the ideas submitted are accepted.

(Id. ¶ 123.)  For instance, in 2014 there were a total of 60 suggestions received through the

IDEAS program.  (Id.).  Of those 60, one was returned to the employee for additional details, and

---

[16]      Wu contests the accuracy of this determination, based on his own correspondence
         with a sales representative at the company that licensed the software.  (Pl. 56.1 St.
         ¶ 119.)

another required confirmation of details from the safety department.  (Def. 56.1 St. ¶ 123.)  Of the remaining 58 suggestions, only five were approved.  (Id.)  For the five suggestions submitted in 2014 that were approved, the awards ranged from $100.00 to $553.86.  (Id. ¶ 126.)

On or about January 23, 2014, the Corporate & Public Affairs Department received a suggestion from Metro-North employee Joseph Phillips recommending that all data be made accessible on the local area network.  (Id. ¶ 131.)[17]  On or about February 12, 2014, the Corporate & Public Affairs Department received a suggestion from Wu entitled "create new database back-up that is smaller."  (Id.)  On February 12, 2014, those suggestions were forwarded to Mezzanotte by Meredith Conti, Corporate Relations Representative, with a note asking to return enclosed evaluation forms to Conti no later than March 14, 2014.  (Id.)  On March 13, 2014, Mezzanotte forwarded the request to Haw and informed him that responses on Phillips' and Wu's suggestions were due the following day.  (Id.)  Mezzanotte asked for Haw's assistance in evaluating the suggestions from a technical perspective and apologized for the late notice in forwarding them.  (Id.)  On or about March 14, 2014, Haw provided Mezzanotte with his evaluation of both suggestions.  (Id. ¶ 132.)  Neither was recommended for acceptance.  (Id.)  Haw found that Wu's suggestion did not offer any significant savings to Metro-North, that it did not properly safeguard Metro-North's data, and that it was not original.  (Id.)[18]  On or about March 17, 2014, Mezzanotte emailed the completed suggestion review forms for Wu and Phillips back to Conti.  (Id.)  By separate letters to the employees, dated July 16, 2014, Corporate & Public Affairs declined Wu's and Phillips' suggestions.  (Id. ¶ 133.)

---

[17]     Wu claims that Phillips was a management employee and that, therefore, he was ineligible for the IDEAS Program.  (Pl. 56.1 St. ¶ 131.)

[18]     Wu disputes Haw's determinations with respect to his IDEAS suggestion.  (See Pl. 56.1 St. ¶ 132.)

In May 2015, Wu appealed the denial of his IDEAS suggestion by letter to Sidney Gellineau, the MTA's CIO.  (Def. 56.1 St. ¶ 134.)  At the end of that month, Koehler was assigned to conduct a new review of Wu's submission in response to Wu's appeal.  (Id.)  By email dated July 2, 2015, Koehler reaffirmed the denial of Wu's suggestion.  (Id.)  Haw was not involved in evaluating or deciding the appeal.  (Id.)

*Wu's Discrimination Complaints*

Metro-North maintains a policy against unlawful discrimination and retaliation in employment that is disseminated to all of its employees.  (Id. ¶ 143.)  Employees may bring complaints of discrimination and retaliation to Metro-North's Office of Diversity and Equal Employment Opportunity ("EEO") for investigation.  (Id.)  In 2013, Wu filed several complaints with the Office of Diversity and EEO, each of which was thoroughly and promptly investigated and determined to be without merit.  (Id. ¶ 144.)  On or about June 21, 2013, Wu filed a complaint with the Office of Diversity and EEO, claiming "discrimination against employees of a certain age," when certain former IT management employees lost their lifetime medical benefits upon accretion to the TCU.  (Id. ¶ 145.)  In response, Robert Rodriguez ("Rodriguez"), the director of the Office of Diversity and EEO, emailed Wu to let him know that the loss of benefits was the result of the action of employees rather than Metro-North, and therefore his office would be unable to address the complaint.  (Id. ¶ 146.)

On or about July 23, 2013, Wu again complained to the Office of Diversity and EEO.  (Id. ¶ 147.)  Wu met with Maryann Gormley-O'Connor ("Gormley-O'Connor"), complaining again about his loss of medical benefits, as well as about Haw's management style. By letter dated August 7, 2013, Luis Taveras, a human resources generalist, advised Wu that the change to his medical benefits did not constitute a violation of the FMLA, and that his

allegations against Haw were unsubstantiated.  (Def. 56.1 St. ¶ 147.)

On or about August 1, 2013, the Office of Diversity and EEO received a new internal discrimination complaint from Wu, alleging that certain instances of Haw's conduct constituted age and disability discrimination.  (Def. 56.1 St. ¶ 149.)  Wu complained that Haw expressed that he wanted Wu to retire and that, when Wu refused to do so, Haw was very upset and angry, and retaliated against him.  (Id.)  On or about August 9, 2013, Wu filed another complaint with the Office of Diversity and EEO, alleging age, disability and FMLA-based discrimination.  (Id. ¶ 150.)  In this complaint, Wu stated that on April 2, 2013, when Wu provided Haw with an FMLA application for Haw to sign, Haw had said "if I were in your situation (referring to [Wu's] age and health conditions) I would prefer to retire early."  (Id.)  Gormley-O'Connor conducted a full investigation of Wu's complaints, including interviews of Wu and Haw.  (Id. ¶ 151.)  On or about August 29, 2013, Gormley-O'Connor sent Wu a letter informing him of the findings concerning his discrimination complaint.  (Id.)  Gormley-O'Connor also provided Haw with a letter informing him that the Office of Diversity and EEO had investigated Wu's complaints and determined that it was unable to conclude that Haw had violated Metro-North's 2013 equal opportunity policy.  (Id. ¶ 152.)  In her closing summary, Gormley-O'Connor noted that Wu had vacillated on the importance of lifetime medical benefits, that Haw had reported the same, and that Wu had been open about his medical conditions with Haw, which likely prompted Haw to remark that if he were similarly situated he would retire. (Id. ¶ 153.)

On or about October 28, 2013, Rodriguez received a letter from Wu alleging that he had been subjected to retaliation by Haw, because Haw would not permit him a schedule change accommodation since he complained of discrimination.  (Id. ¶ 154.)  Rodriguez advised

Wu that the Office of Diversity and EEO did not process reasonable accommodation requests, and referred Wu to Martens to handle the issue.  (Def. 56.1 St. ¶ 154.)

On or about October 30, 2013, Wu filed another internal discrimination complaint form, in which he complained about Haw's critical memorandum of July 22, 2013, as well as the projects that had been assigned to him, and the fact that he was not permitted to change his work schedule.  (Id. ¶ 155.)  On or about November 19, 2013, Roberto Aguirre Sr., the Assistant Director of the Office of Diversity and EEO, sent Wu a letter advising him that his complaint was being closed because it had already been investigated.  (Id. ¶ 156.)

On January 30, 2014, Metro-North's legal department received a copy of a charge of discrimination filed by Wu with the U.S. Equal Employment Opportunity Commission ("EEOC").  (Id. ¶ 157.)  Haw did not become aware of the EEOC charge until in or around February 2014.  (Id. ¶ 158.)  The charge alleged that, in October 15, 2012, Wu had submitted a written complaint to the MTA Office of Inspector General ("OIG") and attached a copy of the alleged complaint.  (Id. ¶ 159.)  The complaint filed with the OIG does not allege age discrimination.  (Id.)

On or about March 14, 2014, Wu sent an email to Metro-North President Giulietti complaining of discrimination.  (Id. ¶ 160.)  The complaint was responded to by Kathryne Betties-Kendall, by letter dated March 14, 2014, in which Betties-Kendall noted that she had been advised by Metro-North's legal department that the matter was being addressed in the instant legal proceeding.  (Id.)

<u>D</u>ISCUSSION

<u>Defendants' Motion to Strike</u>

Defendants move, pursuant to Federal Rule of Civil Procedure 37(c)(1), to preclude the declarations of proposed witnesses Jack Sim, Bradley Liu, Shaoming Chang and Pamela Sokolosky (the "Declarants"), Docket Entry No. 130, Exs. J, K, L & M (the "Declarations"), which have been proffered by Plaintiff in opposition to Defendants' summary judgment motion.

Federal Rule of Civil Procedure 37(c)(1) provides that, "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion . . .  unless the failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1).  Moreover, Rule 26(a)(3) provides that "a party must provide to the other parties and promptly file the following information about the evidence that it may present at trial other than solely for impeachment: (i) the name and, if not previously provided, the address and telephone number of each witness – separately identifying those the party expects to present and those it may call if the need arises."  Fed. R. Civ. P. 26(a)(3).  It is uncontested that Plaintiff did not provide any information about the Declarants during the discovery process.  Plaintiff, however, argues that he did not violate Rule 26 because the Declarations are offered as impeachment evidence, and thus are exempt from disclosure under Rule 26.

Impeachment evidence is defined as "[e]vidence used to undermine a witness's credibility."  <u>Black's Law Dictionary</u> (10th Ed. 2014); <u>see also</u> <u>Friedman v. Rehal</u>, 618 F.3d 142, 153 (2d Cir. 2010) (defining impeachment evidence as "evidence that is offered to discredit a witness . . . to reduce the effectiveness of her testimony by bringing forth evidence which

explains why the jury should not put faith in her or her testimony") (internal quotations and

citation omitted).  By contrast, rebuttal evidence refers to "[e]vidence offered to disprove or

contradict the evidence presented by an opposing party."  618 F.3d at 153.  Plaintiff argues that

he offers the Declarations solely for the purpose of impeaching the testimony of Defendant Haw

and other Metro-North employees, on which Defendants rely heavily in moving for summary

judgment.  However, the Declarations are devoid of any statements regarding the credibility of

Defendants' witnesses.  Rather, they concern the work performance and behavior of Plaintiff,

which Defendants have attempted to characterize through the testimony of their witnesses.  It is

therefore apparent that the Declarations have been offered to contradict the witnesses' factual

testimony rather than to undermine their credibility.  The Court thus concludes that the

Declarations are not impeachment evidence and, therefore, Plaintiff's failure to provide

information to about the Declarants to Defendants during the course of discovery constituted a

violation of Rule 26(a)(3).

    "Even where there is violation of Rule 26(a) or (e), courts may not impose

sanctions under Rule 37(c)(1) where a party's failure to comply was 'substantially justified' or

where the conduct was 'harmless.'"  Ritchie Risk-Linked Strategies Trading (Ireland), Ltd. v.

Coventry First LLC, 280 F.R.D. 147, 159 (S.D.N.Y. 2012).  A failure to disclose is substantially

justified when "there is justification to a degree that could satisfy a reasonable person that parties

could differ as to whether the party was required to comply with the disclosure request, or if

there exists a genuine dispute concerning compliance."  AIG Global Asset Management

Holdings v. Branch et al., No. 04CV8803, 2005 WL 425494-RMB-THK, at *1 (S.D.N.Y. Feb.

18, 2005) (internal quotations and citation omitted).  Harmlessness under Rule 37(c)(1) requires

an "absence of prejudice to the defendant."  Ritchie Risk, 280 F.R.D. at 159.  Here, Plaintiff does

not argue that his Rule 26(a) violation was harmless, but rather that his failure to disclose the subject witnesses was substantially justified in light of his belief that the Declarants were not subject to Rule 26(a) disclosure as witnesses offered for the purpose of impeachment.  As explained above, however, the Declarations focus entirely on Plaintiff's work performance, a principal fact issue, and thus were plainly offered for the purpose of contradicting Defendants' evidence.  Accordingly, Plaintiff's failure to comply with Rule 26(a)(3) was not substantially justified.

Given that Plaintiff has failed to comply with Rule 26(a), and that this failure was not substantially justified or harmless, the Court must determine whether to impose the preclusionary sanction requested by Defendants.  When determining whether to preclude evidence pursuant to Federal Rule of Civil Procedure 37(c)(1), a court must consider four factors: "(1) the party's explanation for the failure to comply with the disclosure requirement; (2) the importance of the testimony of the precluded witnesses; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and (4) the possibility of a continuance."  Patterson v. Balsamico, 440 F.3d 104, 117 (2d Cir. 2006).

The first factor weighs in favor of preclusion in this case.  The only explanation proffered by Plaintiff for his failure to disclose the witnesses is his unfounded belief that the Declarations constitute impeachment evidence rather than rebuttal evidence.  The second factor also weighs in favor of preclusion.  The case is currently at the summary judgment stage, and Plaintiff concedes that the Declarations are not integral to the Court's determination of the instant summary judgment motion.  (See Docket Entry No. 152, Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Preclude and Strike the Declarations at pp. 10-11) ("Defendants are correct in their assertion that the Declarants' testimony is not being directly

used to determine a material issue in the case"; "Plaintiff agrees with Defendants that the evidence is not material to the determination of Defendants' summary judgment motion.").[19]

With respect to the third factor, Plaintiff argues that Defendants have failed to demonstrate any specific prejudice that they would suffer if the Declarations were not stricken from the record.  In response, Defendants argue that they would be prejudiced by the lack of opportunity to depose the Declarants and to examine whether they are indeed qualified to testify on the subjects for which they are being proffered.  The Court agrees, and finds that the third factor weighs in favor of preclusion. The fourth factor also weighs in favor of preclusion.  The close of discovery counsels strongly against the granting of a continuance. See Design Strategy, Inc. v. Davis, 469 F.3d 284, 297 (2d Cir. 2006).  Discovery in this action closed on August 28, 2015 (see Docket Entry No. 73), and the action is currently at the summary judgment stage.

The Court is well aware that preclusion is a harsh sanction, Design Strategy, 469 F.3d at 297, and that a district court "should inquire more fully into the actual difficulties which the violation causes, and must consider less drastic responses" before implementing a preclusionary sanction.  Outley v. City of New York, 837 F.2d 587, 591 (2d Cir. 1988).  Upon thorough review of the record, the Court concludes that preclusion is appropriate here.  Thus, the subject declarations are stricken for the purposes of deciding the instant summary judgment motion.

Defendants also seek attorneys' fees and costs associated with their preclusion motion, pursuant to Rule 37(c)(1)(A).  "Courts in this circuit have often awarded attorneys' fees to sanction a party who disregards her discovery obligations."  Tse v. UBS Financial Services,

---

[19]     The Court limits its preclusion decision to the context of this motion practice.

Inc., 568 F. Supp. 2d 274, 321 (S.D.N.Y. 2008).  Furthermore, Defendants represent that they

provided Plaintiff with at least one opportunity to voluntarily withdraw the Declarations before

making the motion.  (See Docket Entry No. 148, Declaration of Linda Wong in Support of

Motion to Preclude and Strike Declarations, ¶¶ 2-5.)  In light of these facts, the Court finds it

appropriate to award Defendant its attorneys' fees and costs associated with the filing of their

preclusion motion.  Defendants are directed to promptly submit to the Court an application for

fees and costs associated with the motion.


Rule 56 Summary Judgment Standard

        Rule 56(a) of the Federal Rules of Civil Procedure provides that summary

judgment is to be granted in favor of a moving party where that party can demonstrate "that there

is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law."  Fed R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

Thus, a party that is unable to "make a showing sufficient to establish the existence of an

element essential to that party's case, and on which that party will bear the burden of proof at

trial" will not survive a Rule 56 motion.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

The moving party bears the burden of demonstrating the absence of a material fact, and the court

must be able to find that, "'after drawing all reasonable inferences in favor of a non-movant, no

reasonable trier of fact could find in favor of that party.'"  Marvel Entertainment, Inc. v.

Kellytoy (USA), Inc., 769 F. Supp. 2d 520, 523 (S.D.N.Y. 2011) (quoting Heublein v. United

States, 996 F.2d 1455, 1461 (2d Cir. 1993)).

        For the purposes of summary judgment motion practice, a fact is considered

material "if it might affect the outcome of the suit under the governing law," and an issue of fact

is "genuine" where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Holtz v. Rockefeller & Co. Inc., 258 F.3d 62, 69 (2d Cir. 2001) (internal quotation marks and citations omitted). "[M]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist." Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (internal quotation marks and citation omitted). "As to issues on which the non-moving party bears the burden of proof, the moving party may simply point out the absence of evidence to support the nonmoving party's case." Nora Beverages, Inc. v. Perrier Group of Am., Inc., 164 F.3d 736, 742 (2d Cir. 1998).

Wu's Discrimination Claims Under the ADA and ADEA

        "The burden-shifting framework laid out in McDonnell Douglas Corp. v. Green . . . governs claims of discrimination under [both] the ADA [and the] ADEA." Ben-Levy v. Bloomberg, L.P., 518 F. App'x 17, 18 (2d Cir. 2013). See also Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 110 (2d Cir. 2010) ("Claims for age based-discrimination brought pursuant to the ADEA are analyzed under the burden-shifting framework of McDonnell Douglas Corp. v. Green."); Primmer v. CBS Studios, Inc., 667 F. Supp. 2d 248, 256 (S.D.N.Y. 209) ("Disability discrimination claims under the ADA are analyzed under the familiar burden-shifting framework established by the Supreme Court in McDonnell Douglas Corp. v. Green."). "Under the McDonnell Douglas framework, the plaintiff must first establish a prima facie case of discrimination . . . [a] plaintiff meets that burden by showing that (1) [he] was within the protected age group, (2) [he] was qualified for [his] position, (3) [he] suffered an adverse

employment action,[20] and (4) that action took place in circumstances giving rise to an inference

of discrimination."  Holtz, 258 F.3d at 76-77 (internal quotation marks and citations omitted).

With respect to the final factor, "[a] showing of disparate treatment – that is, a showing that the

employer treated plaintiff less favorably than a similarly situated employee outside his protected

group – is a recognized method of raising an inference of discrimination for purposes of making

out a prima facie case."  Mandell v. County of Suffolk, 316 F.3d 368, 379 (2d Cir. 2003)

(internal quotation marks and citation omitted).

　　　　　"By making out this 'minimal' prima facie case, even without evidence of

discrimination, the plaintiff creates a presumption that the employer unlawfully discriminated

. . . and thus places the burden of production on the employer to proffer a nondiscriminatory

reason for its action."  James v. New York Racing Association, 233 F.3d 149, 154 (2d Cir. 2000)

(internal quotation marks and citations omitted); see also McPherson v. NYC Dep't of Educ.,

457 F.3d 211, 215 (2d Cir. 2006).  Should the employer be able to proffer such a

nondiscriminatory reason, "the presumption [of discrimination] evaporates and the plaintiff must

prove that the employer's proffered reason was a pretext for discrimination."  McPherson, 457

F.3d at 215.  The burden of persuasion in an ADEA case requires the Plaintiff to prove by a

preponderance of the evidence that age was the "but-for" cause of the challenged employer

decision.  See generally Gross v. FBL Financial Services, Inc., 557 U.S. 167 (2009).

　　　　　Here, assuming, arguendo, that Plaintiff is able to make out a prima facie case for

each of his discrimination claims, each still fails as a matter of law because Defendants have

proffered legitimate, nondiscriminatory reasons for their actions and Wu has failed to

---

[20]　　　　For the purposes of its analysis here, the Court assumes, but does not decide, that
Wu has satisfied the "adverse action" element of this inquiry.

demonstrate that the proffered reasons are pretexts for discrimination.

        *1.  Reduction of Health Benefits*

        In his complaints to Metro-North, the OIG, DOL and DOJ Wu claimed that he had suffered a discriminatory (disparate treatment) reduction of benefits when he and other newly unionized TCU employees lost their lifetime medical benefits.  In his Amended Complaint, Wu characterizes the elimination of lifetime retiree medical benefits as an action taken against "older employees who refused to retire."  (See Docket Entry No. 24, Amended Complaint ¶ 24.)

        Wu's opposition to the summary judgment motion makes no argument relating to the elimination of lifetime retiree medical benefits at all, however.  Furthermore, Defendants have made an uncontroverted proffer that elimination of Plaintiff's lifetime medical benefits was based on the accretion of the DBA positions into the TCU, rather than any protected status or protected activity.  (Def. 56.1 St. ¶¶ 34-35, 40-41.)  The Supreme Court has recognized that "there is no disparate treatment under the ADEA when the factor motivating the employer is some feature other than the employee's age."  Hazen Paper Co. v. Biggins, 507 U.S. 604, 609 (1993).  In other words, "a disparate treatment claim cannot succeed unless the employee's protected trait actually played a role in that process and had a determinative influence on the outcome."  Id. at 610.  ADA discrimination and retaliatory treatment claims similarly require the demonstrate of a causal link to prohibited animus.  Cf. De La Rosa v. City of New York Police Dept., No. 09CV5290-SAS, 2010 WL 4177626 (S.D.N.Y. Oct. 22, 2010) ("Although I cannot conclude that De La Rosa is not disabled under the ADA, she fails to establish a prima facie case of discrimination because she cannot show a causal link between the adverse employment actions and her disability"); Gordon v. New York City Bd. of Educ., 232 F.3d 111, 117 (2d Cir.

2000) ("This Court . . . has consistently held that proof of causation can be shown . . . directly, through evidence of retaliatory animus directed against the plaintiff by the defendant.")

   The Court therefore grants Defendants' motion for summary judgment insofar as they seek dismissal of Wu's claims based on the elimination of lifetime medical benefits following accretion of the IT DBAs into the TCU.

     *2. Response to Software License Complaint*

   In or about April 2014, Wu requested Reflection X Windows software in order to perform a task that had been assigned to him.  (Def. 56.1 St. ¶ 119.)  Wu thereafter raised an issue about whether Metro-North held a valid license for use of the software.  (Id.)  Metro-North claims that it looked into the matter and found that the software was covered by an MTA-wide license that applied to all MTA subsidiary agencies, including Metro-North.  (Id.)  Wu sent Koehler several emails, between June 26 and 30, 2014, complaining about the alleged use of unlicensed software at Metro-North, and Koehler met with Wu to assure him that Metro-North had an appropriate license for the software.  (Id. ¶ 120.)  Wu disputes that Metro-North held an appropriate license.  (Pl. 56.1 St. ¶¶ 119-20.)

   Wu cannot make out a prima facie case of age- or disability-related discrimination on the basis of Defendants' response to his concerns about the Reflection X Windows software.  The fact that his supervisors may not have responded in a manner that Wu felt was appropriate does not demonstrate that he suffered an "adverse employment action" for the purposes of an ADA or ADEA discrimination claim, which must constitute "a materially adverse change in the terms and conditions of employment."  Caskey v. County of Ontario, 560 F. App'x 57, 58 (2d Cir. 2014).  "Examples of such materially adverse changes include termination of employment, a demotion evidenced by a decrease in wage or salary, a less

distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation."  <u>Caskey</u>, 560 F. App'x at 58 (internal citations and quotation marks omitted).

Moreover, Wu fails to proffer any evidence demonstrating that Defendants' action took place under circumstances giving rise to an inference of discrimination.  <u>See</u> <u>Holtz</u>, 258 F.3d at 76-77.  While it may be the case that Wu disagrees with Defendants' assessment of the propriety of their use of this software, he has pointed to no evidence that tends to show that Defendants' response to his concerns was in any way age- or disability-related.  Thus, Wu has not made a prima facie showing that Defendants' behavior in this instance constituted actionable discrimination under either the ADA or ADEA.  In light of the foregoing, the Court grants Defendants' motion and dismisses Wu's ADA and ADEA discrimination claims insofar as they are based on this incident.

<u>Retaliation Under the ADEA and ADA</u>[21]

Like discrimination claims, retaliation claims brought pursuant to the ADEA and the ADA are analyzed under the burden-shifting framework set out in <u>McDonnell Douglas</u>.  <u>See</u> <u>Terry v. Ashcroft</u>, 336 F.3d 128, 141 (2d Cir. 2003) ("The <u>McDonnell Douglas </u>burden shifting analysis used in claims of discrimination in violation of Title VII also applies to retaliation claims . . . The same standards and burdens apply to claims of retaliation in violation of the ADEA."); <u>Reyes v. Krasdale Foods, Inc.</u>, 945 F. Supp. 2d 486, 493 (S.D.N.Y. 2013) ("Retaliation claims under the ADA are also evaluated under the <u>McDonnell Douglas</u>

---

[21]     Because Wu's complaints of age- and disability-related discrimination appear largely to overlap, the Court deems his retaliation claims as being raised pursuant to both of these statutes.

burden-shifting framework.") (citing <u>Lovejoy-Wilson v. NOCO Motor Fuel, Inc.</u>, 263 F.3d 208, 223 (2d Cir. 2001)).  "The court's first step is to determine whether the plaintiff established a prima facie case of retaliation . . . A prima facie case of retaliation under the ADEA [or ADA] requires proof that: (1) the plaintiff was engaged in an activity protected under the ADEA [or ADA]; (2) the employer was aware of the plaintiff's participation in the protected activity; (3) the plaintiff was subject to an adverse employment action;[22] and (4) there is a nexus between the protected activity and the adverse action taken." <u>Wanamaker v. Columbian Rope Co.</u>, 108 F.3d 462, 465 (2d Cir. 1997).  "Even if a plaintiff establishes a prima facie case of retaliation, if the defendant identifies a legitimate, non-discriminatory reason for the adverse employment action, the burden shifts back to the plaintiff to show that the proffered reason is a pretext for retaliation." <u>Wright v. Storch, Amini & Munves, P.C.</u>, No. 12CV2852-LTS-MHD, 2014 WL 1663125 (S.D.N.Y. Apr. 25, 2014) (citing <u>Hicks v. Baines</u>, 593 F.3d 159, 160 (2d Cir. 2010)).

"For the final element of a retaliation claim, proof of causation can be shown either: (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." <u>Bryant v. Greater New Haven Transit Dist.</u>, 8 F. Supp. 3d 115, 133 (D. Conn. 2014) (citing <u>Hicks</u>, 593 F.3d at 170) (internal quotation marks omitted).  Here, Wu does not point to any evidence, and the Court finds none in the record, directly indicative of any retaliatory animus on the part of Defendants; therefore, he must rely on circumstantial evidence to establish his prima facie case.  "The cases that accept

---

[22] For the purposes of its analysis here, the Court assumes, but does not decide, that Wu has satisfied the "adverse action" element of this inquiry.

mere temporal proximity between an employer's knowledge of protected activity and an adverse

employment action as sufficient evidence of causality to establish a prima facie case uniformly

hold that the temporal proximity must be very close."  Murray v. Visiting Nurse Services of

N.Y., 528 F. Supp. 2d 257, 275 (S.D.N.Y. 2007) (internal quotation marks and citations

omitted); see also Pierre v. Napolitano, 958 F. Supp. 2d 461, 484 (S.D.N.Y. 2013) (collecting

cases, citing Murray for proposition that "district courts within the Second Circuit have

consistently held that the passage of two to three months between the protected activity and the

adverse employment action does not allow for an inference of causation.").  Assuming,

arguendo, that Wu can prove that he suffered adverse employment actions in response to any

protected actions that he may have engaged in, his claims fail because he has not demonstrated a

nexus between any such protected activities and alleged adverse actions.[23]  Nor has Wu

demonstrated that the legitimate, non-discriminatory reasons that Defendants have proffered as

justification for complained-of actions constitute pretexts for discrimination.  The particulars of

---

[23]     The record reflects several instances of Wu engaging in at least arguably
protected activity: his October 15, 2012, complaint to the MTA OIG, the
Department of Labor and the United States Department of Justice (AC ¶ 17; Def.
56.1 St. ¶ 159); a June 21, 2013, complaint to the Office of Diversity and EEO
(Id. ¶ 145); a July 23, 2013, complaint to the Office of Diversity and EEO (Id. ¶
147); a July 30, 2013, complaint to the Office of Diversity and EEO, which was
resubmitted on August 1, 2013 (Id. ¶¶ 148-49); an August 9, 2013, complaint to
the Office of Diversity and EEO (Id. ¶ 150); an October 28, 2013, letter from Wu
to Rodriguez (Id. ¶ 154); an October 30, 2013, complaint to the Office of
Diversity and EEO (Id. ¶ 155); an October 30, 2013, Charge of Discrimination
filed with the EEOC, received by Metro-North on January 30, 2014 (AC ¶ 26;
Def. 56.1 St. ¶ 157; and a March 14, 2014, email complaint sent by Wu to Metro-
North President Joseph Giulietti.  (Def. 56.1 St. ¶ 160.)  See Hernandez v.
International Shoppes, LLC, 100 F. Supp. 3d 232, 267 (E.D.N.Y. 2015) ("The
term 'protected activity' refers to action taken to protest or oppose statutorily
prohibited discrimination, and may take the form of either formal or informal
complaints"); see also Felton v. Katonah Lewisboro School Dist., No. , 2009 WL
2223853, at *6 (S.D.N.Y. July 27, 2009) ("it is clear that informal complaints to
management are considered protected activity under . . . the ADA.").

his claims are reviewed below.

>    *1.  Modification of Plaintiff's Work Schedule*

Wu claims that Defendants retaliated or discriminated against him by denying him the modified work schedule that he requested as an accommodation of his health issues.[24] (See Opp. Memo at pp. 30-32.)  In or around October 2013, Wu asked for a change in his work schedule permitting him to leave early five days a week.  (See Def. 56.1 St. ¶¶ 103, 105.) Ultimately, the IT Department decided that it could accommodate Wu's early departure from work one day per week, with a second day permitted as required.  (See id. ¶ 107.)  While this determination may have occurred close enough in time to one of Wu's several internal complaints to satisfy the temporal nexus requirement of Wu's prima facie retaliation claim (he fails to link this decision to any specific complaint), Defendants have proffered legitimate, non-discriminatory reasons for their decision to deny Wu the five day per week accommodation that he sought.  Defendants represent that Metro North's Occupational Health Services Office evaluated his request by reviewing notes from his doctors and ultimately determined that a five-day change in his schedule was not necessary to accommodate medical appointments.  (Id. ¶¶ 109-112.)  Although Wu criticizes Defendants' evaluation of his request (see Pl. 56.1 St. ¶¶ 109-112) he has pointed to no admissible evidence, other than his own disagreements with Defendants regarding the quality of his work performance, to support his assertion that this proffered rationale is actually pretext for discrimination.  Courts are not permitted to second-guess an employer's evaluative business determinations, such as the one Metro-North's Occupational Health Services Office made in this case.  See, e.g., Phipps v. Comprehensive

---

[24]    The Court assumes, but does not decide, for the purposes of this analysis that Wu's health conditions, individually or in combination, render him an individual with a disability within the meaning of the ADA.

Community Development Copr., No. 00CV6063-RJH, 2005 WL 287413, at *18 (S.D.N.Y. Feb. 4, 2005) ("it is well settled that courts should not second-guess the good-faith business determinations and criteria that employers adopt in running their organizations"); Maturine v. American Intern. Group, Inc., No. 04CV9064-GBD, 2006 WL 2347806 (S.D.N.Y. Aug. 14, 2006) ("It is not the Court's role to second-guess an employer's non-discriminatory business decisions.")

Moreover, Metro-North has represented that providing such an accommodation would have created a business risk by lowering DBA coverage below acceptable levels during certain hours.  (Def. 56.1 St. ¶ 107.)  Once again, Wu fails to point to any evidence supporting a finding that this justification is pretextual.[25]  Thus, because Wu has not demonstrated that the non-discriminatory reasons proffered by Defendants as the basis of denying his accommodation request are pretext for a retaliatory motive, the Court grants Defendants' motion for summary judgment insofar as it seeks dismissal of Wu's retaliation claims based on this decision.  Nor has Plaintiff proffered any evidence demonstrating that Defendants handled accommodation requests from non-older or non-disabled employees in a different manner.  Therefore, to the extent that Wu has asserted an ADA or ADEA discrimination claim on the basis of the denial of the request,

---

[25]    Wu does assert that Defendants did not sufficiently attempt to have other DBAs trade shifts with him in order to accommodate his request, thereby raising the spectre of pretext.  (See Pl. 56.1 St. ¶ 103; Opp. Memo at pp. 29-30.)  Wu argues that this fact, taken in his favor, suffices to show that a triable issue exists as to whether his age was a "but for" cause of Defendants decision here.  (See Opp. Memo at p. 14, citing Delaney v. Bank of America Corp., 766 F.3d 163, 168 (2d Cir. 2014).)  "But for" causation, however, requires a showing that a plaintiff would not have suffered an adverse action in the absence of a discriminatory motive.  See id. at 169.  Based on the record before it, the Court concludes that a reasonable finder of fact could not find that Defendants' age or disability status was a "but for" cause of Defendants' decision to deny Wu a five day per week schedule accommodation. Wu has failed to raise an issue of fact as to whether Defendants' proffered reason for the decision was pretextual.

that claim must also be dismissed.  See Mandell, 316 F.3d at 379.

   *2.  Wu's IDEAS Submission*

   Wu also claims that Defendant Haw retaliated against him by delaying submission of his IDEAS proposal to the appropriate parties at Metro North.  It is undisputed that Wu submitted his IDEAS proposal to Metro-North's Corporate & Public Affairs Department on or about February 12, 2014.  (Def. 56.1 St. ¶ 131.)  It is also undisputed that Wu's suggestion was forwarded, along with one from Metro-North employee Joseph Phillips (which had been submitted on or about January 23, 2014), to Mezzanotte by Meredith Conti on February 12, 2014.  (Id.)  On March 13, 2014, Mezzanotte forwarded the proposals to Haw, asking for assistance in evaluating them, and apologizing for the late notice in forwarding them. (Id.)  It is undisputed that he forwarded his analysis to Mezzanotte on March 14, 2014, one day after he had received the proposals from Mezzanotte.  (Id. ¶ 132.)[26]  Ultimately, Wu's IDEAS submission was rejected, a decision that was upheld on appeal.  (Id. ¶¶ 133-34.)

   Based on this record, there is no evidence that Haw did anything to delay submission of Wu's IDEA proposal.  Rather, he turned around the proposal with his recommendation to Mezzanotte in a single day.  (Id. ¶ 132.)  Haw sent Wu's proposal back to Mezzanotte at the same time as he did the proposal of Joseph Phillips, whose proposal had been submitted several weeks earlier, a fact that undercuts Wu's suggestion that Haw engaged in a delay intended to harm Wu.  (Id.)  Moreover, Wu has failed to link this purported "delay" to any protected action that he may have engaged in, which is fatal to his retaliation claim.  See Hicks, 593 F.3d at 160.  The internal complaint lodged by Wu that is closest in time to Haw's allegedly

---

[26]   While Wu disputes the conclusion of Haw's analysis, he does not dispute its timing.  (See Pl. 56.1 St. ¶ 132.)

retaliatory action was filed on October 13, 2014 – four months prior to Haw's purported delay

and recommendation to deny the IDEAS submission, and insufficiently close in time to establish

a causal nexus for the purpose of a retaliation claim under Second Circuit case law.  See, e.g.,

Murray, 528 F. Supp. at 275.[27]  Finally, Defendants have proffered legitimate business reasons

for the denial of Wu's IDEAS submission; namely, that it did not offer significant savings to

Metro-North and did not properly safeguard Metro North's data.  (Def. 56.1 St. ¶ 132.)

Although Wu disagrees with Haw's ultimate analysis of his IDEAS submission (see Pl. 56.1 St.

¶ 132), he has not offered any evidence demonstrating that Defendants' proffered justification is

a pretext for discrimination.  In light of this, the Court grants Defendants' motion for summary

judgment insofar as it seeks dismissal of Wu's retaliation claim on the basis of the delay or

denial of his IDEAS proposal.

Wu has also failed to proffer evidence demonstrating that any younger, non-

disabled employees were subject to more favorable treatment with respect to their IDEAS

submissions.  Wu thus fails to frame a disparate treatment claim with respect to age or disability

on the basis of the disposition of the IDEAS submission.  Mandell, 316 F.3d at 379.  Nor has he

otherwise pointed to evidence demonstrating that the delay or denial of his IDEAS submission

"took place in circumstances giving rise to an inference of discrimination."  Holtz, 258 F.3d at

76-77.  The Court therefore grants Defendants' motion for summary judgment insofar as it seeks

dismissal of any ADA or ADEA discrimination claim based on the purported delay or denial of

his IDEAS submission.

---

[27]     Although the record does indicate that Wu sent an email complaint to Joseph
Giulietti on March 14, 2014 (Def. 56.1 St. ¶ 160), Wu has failed to establish that
Haw was aware of this email, and thus it cannot serve as the protected activity for
the purposes of this particular retaliation claim.

### 3. *Denial of Overtime*

Wu also cites the denial of overtime pay as a form of retaliation inflicted by Defendants.  (See Opp. Memo at p. 32.)  Based on the record before it, the Court can discern three instances of Plaintiff being denied overtime.  First, Wu was denied overtime for work done on May 17, 2011.  (Def. 56.1 St. ¶ 136.)  It is undisputed, however, that he was denied overtime on that occasion because he was unable to log into the appropriate system and perform the work required to troubleshoot that system.  (Id.; Pl. 56.1 St. ¶ 136.)  Moreover, the denial occurred prior to any complaints made by Plaintiff and thus could not have been made in response to a protected activity.  It therefore was not, as a matter of law, retaliatory.

In May 2014, Wu was denied overtime for 37 minutes worth of work that he did in the middle of the night.  (See Pl. 56.1 St. ¶ 137.)  Defendants have proffered evidence – an email chain including Haw and Mezzanotte – demonstrating that Wu's claim for overtime based on this work was denied in light of Wu's inability to resolve the trouble call and in support of their statement that "Wu's age and/or disability played no role in the decision to deny him overtime."  (See Def. 56.1 St. ¶¶ 138-39.)  Wu does not dispute that he was unable to resolve the problem.  (Pl. 56.1 St. ¶ 138.)  Nor does he appear to dispute the claim that his age and disability had nothing to do with the denial of overtime.  (See id.)  Rather, Wu asserts that he was unable to resolve the issue because "attempts to login resulted in a total failure of VPN access."  (Id.)  This, however, does not controvert Defendants' assertion that the decision to deny him overtime was based on his inability to fix the problem at hand, rather than his age or disability, and Wu has proffered no evidence from which the Court might conclude that the legitimate, non-discriminatory reason provided by Defendants for the denial of overtime is pretext for discrimination.  Thus, this denial of overtime cannot serve as the basis for a viable claim of

retaliation.

Finally, on August 13, 2014, Wu's supervisor Stubbs approved him for overtime, but directed him that he could no longer work overtime in the future.  (See Def. 56.1 St. ¶¶ 98, 141.)  As an initial matter, this directive by Stubbs occurred four months after Wu's latest-filed complaint, which is too large a gap in time to establish the causal nexus prong of the prima facie retaliation inquiry within this Circuit.  See, e.g., Murray, 528 F. Supp. at 275.  Moreover, Wu has again failed to dispute or controvert Defendants' proffered reason for this denial of overtime – namely, that Wu had been "unable to successfully complete maintenance assignments twice in the past few months."  (Def. 56.1 St. ¶ 98; Pl. 56.1 St. ¶¶ 98, 141.)  Thus, even if Wu were able to make out a prima facie case of retaliation on this claim, he has once again failed to demonstrate that Defendants' proffered nondiscriminatory reason for this denial of overtime was pretext for discrimination and, therefore, his claim must fail.[28]   In light of the foregoing, Defendants' motion for summary judgment is granted insofar as it seeks dismissal of Wu's retaliation claims regarding the denial of overtime pay.

Additionally, Wu has made no showing that these denials "took place in circumstances giving rise to an inference of discrimination."  Holtz, 258 F.3d at 76-77.  He proffered no evidence that any younger, non-disabled employees were treated differently with respect to overtime payment.  Mandell, 316 F.3d at 379.  Defendants have, furthermore, proffered legitimate, nondiscriminatory reasons for each of them, and Wu has failed to tender evidence from which a reasonable finder of fact might conclude that these reasons were pretexts

---

[28]     Moreover, Wu does not dispute that, on or about June 15, 2014, he worked 38 hours and was unable to upgrade a database, but still was paid overtime, which undercuts his argument that overtime pay was withheld for retaliatory reasons. (Pl. 56.1 St. ¶ 142.)

for discrimination.  Therefore, the Court grants Defendants' motion insofar as it seeks dismissal of Wu's ADA and ADEA discrimination claims on the basis of denial of overtime pay.

> ### 4.   *The July 22, 2013, Performance Memo*

Wu appears to characterize the July 22 Memo that was issued to him by Shaw as a retaliatory act.  (See Op. Memo at pp. 21-22.)  Defendants represent that this memorandum was issued in light of Wu's performance issues in order to formally advise him of concerns regarding his ability to carry out his responsibilities.  (Def. 56.1 St. ¶ 54.)  The July 22 Memo also provided that Wu was to meet with Haw periodically to review his progress.  (Id.)

Wu fails to establish a causal nexus between the July 22 Memo and any of the protected activities in which he engaged.  It is undisputed that Haw had no knowledge of Wu's complaint to the MTA OIG in October 2012 when he drafted the July 22 Memo and presented it to Wu.  (See Def. 56.1 St. ¶ 55; Pl. 56.1 St. ¶ 55.)  And, although Wu did file an internal complaint with the Office of Diversity and EEO on June 21, 2013 (Def. 56.1 St. ¶ 145), within a month of Haw issuing the July 22 Memo, Wu has failed to demonstrate – or even allege – that Haw was aware of this complaint when the July 22 Memo was issued.  Furthermore, the July 22 Memo was issued prior to any other purported protected action that Wu may have engaged in. (See footnote 23, supra.)  Thus, because Wu has not established any causal nexus between his protected activities and Haw's issuance of the July 22 Memo, he cannot make out a prima facie case of retaliation based on this occurrence.  The Court therefore grants Defendants' motion insofar as it seeks dismissal of Wu's ADA and ADEA retaliation claims based on the July 22 Memo.

Wu has also made no showing that issuance of the July 22 Memo  "took place in circumstances giving rise to an inference of discrimination," Holtz, 258 F.3d at 76-77.  Nor has

he proffered any evidence that any younger, non-disabled employees were treated differently with respect to supervision or discipline at work, and thus he cannot make a showing of disparate treatment.  Mandell, 316 F.3d at 379.  The Court therefore grants Defendants' motion for summary judgment insofar as it seeks dismissal of any ADA or ADEA discrimination claim based on issuance of the July 22 Memo.

Wu's Hostile Work Environment Claim[29]

"Under the ADEA, a hostile work environment is one in which 'the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently pervasive to alter the conditions of the victim's employment.'"  Waters v. General Board of Global Ministries, 769 F. Supp. 2d 545, 553 (S.D.N.Y. 2011) (quoting Kassner v. 2nd Avenue Deli, Inc., 496 F.3d 229, 240 (2d Cir. 2007)).  A hostile work environment claim requires a plaintiff to demonstrate  that: (1) he was subjected to harassment, based on age, that was sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment; and (2) that a specific basis exists for imputing the objectionable conduct to the employer.  See Waters, 769 F. Supp. 2d at 553 (citing Alfano v. Costello, 294 F.3d 365, 373 (2d Cir. 2002)).  In order to satisfy the "severe or pervasive" prong, a plaintiff must show that a defendant's conduct: (1) created an environment that a reasonable person would find hostile or abusive; (2) created an environment that plaintiff subjectively perceived as hostile or abusive; and (3) was on account of plaintiff's membership in a protected group.  See Waters, 769 F. Supp.

---

[29]    Wu does not explicitly assert a hostile work environment claim in his Amended Complaint.  (See generally AC.)  He does, however, argue in his opposition brief that he has stated a viable hostile work environment claim.  This position appears to be based on the combination of incidents and allegedly adverse actions that underlie his discrimination and retaliation claims.

2d at 553 (citing <u>Patane v. Clark</u>, 508 F.3d 106, 113 (2d Cir. 2007)).  "The plaintiff must subjectively experience the working environment as abusive and the Court must be satisfied objectively that it is abusive." <u>Gibson v. Wyeth Pharmaceuticals, Inc.</u>, No. 07CV946-LTS, 2011 WL 830671, at *10 (S.D.N.Y. Mar. 9, 2011).

   When evaluating a hostile work environment claim, the court considers the totality of the circumstances.  <u>Patane</u>, 508 F.3d at 113.  Generally, a plaintiff must demonstrate "either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of [his] working environment," <u>Cruz v. Coach Stores, Inc.</u>, 202 F.3d 560, 570 (2d Cir. 2000), since there is no "threshold magic number" of incidents that is necessary to establish a claim as a matter of law. <u>Howley v. Town of Stratford</u>, 217 F.3d 141, 154 (2d Cir. 2000).  "In determining whether the proffered evidence is sufficient to establish the requisite alteration of the employee's working environment, the Court considers "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." <u>Gibson</u>, 2011 WL 830671, at *10 (quoting <u>Harris v. Forklift Systems, Inc.</u>, 510 U.S. 17, 23 (1993)).  Direct evidence of harassment is not necessary to establish such a claim; circumstantial evidence is sufficient. <u>Rivera v. Rochester Genesee Regional Transp. Authority</u>, 743 F.3d 11, 23 (2d Cir. 2012).  The Supreme Court has held that the standards for judging a hostile work environment claim are demanding; courts must avoid construing federal law as a "general civility code." <u>Gibson</u>, 2011 WL 830671, at *10 (quoting <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 787-88 (1998)).

   Wu appears to argue that the hostile work environment to which he was subjected was a product of several cumulative issues: increased supervision and criticism of his work;

denial of the benefit of the IDEAS program; being assigned burdensome projects with unrealistic

deadlines;[30] denial of his work schedule accommodation request; management's failure to

respond to his concerns over software licenses; elimination of his lifetime health benefits; denial

of overtime pay; and comments made by Haw in which he told Wu that, if he were in Wu's

position, he would retire in order to preserve his health benefits.  (See generally AC.)  The Court

has already determined that, with respect to these occurrences, Wu has failed to proffer any

evidence that actions taken by Defendants were motivated by Wu's disability or age, and

Defendants have demonstrated that each was a discrete, independent incident justified by

business decisions.  Thus, Wu cannot demonstrate that a hostile work environment arose "on

account of plaintiff's membership in a protected group," which is fatal to his claim.

With respect to the accumulation of allegedly critical emails Wu's supervisors

sent him and the increased scrutiny he may have received at work, Defendants have proffered

uncontroverted evidentiary support – in the form of a large collection of workplace evaluations –

demonstrating that Wu's work was often deficient.  (See, e.g., Def. 56.1 St. ¶¶ 4-21, 38, 48-80,

89-101.)  While Wu disagrees with Defendants' characterization of these reports and his general

performance at Metro-North, it is uncontested that Wu had a history of performance issues that

---

[30]      Wu complains specifically about the assignment he received on January 29, 2014.
(See AC ¶ 29; Pl. 56.1 St. ¶¶ 84-86.)  However, he does not dispute that, after Wu
voiced concern about the assignment deadline, Haw realized that he had made an
error and corrected it accordingly.  (Id. ¶ 85.)  Moreover, Wu does not dispute
that the assignment was eventually transferred to another employee who had
expressed a desire to learn the technologies required to complete the assignment.
(Pl. 56.1 St. ¶ 86.)  In light of these undisputed facts, the Court holds that no
reasonable finder of fact could conclude that Wu was given, or relieved of, this
assignment on the basis of a discriminatory motive, and therefore Wu cannot
make out an ADA or ADEA discrimination claim on this basis.  Nor was the
January 29, 2014, assignment temporally connected with Wu's protected
activities to a degree that would allow him to make out an ADA or ADEA
retaliation claim on this basis.

were documented as far back as 2004.  This undercuts Wu's argument that any criticism or

discipline he faced at work was due to his membership in a protected group; thus, it cannot serve

as the basis of a hostile work environment claim.  Furthermore, as explained supra, "it is well

settled that courts should not second-guess the good-faith business determinations and criteria

that employers adopt in running their organizations."  Phipps, 2005 WL 287413, at *18; see also

Newsom-Lang v. Warren Int'l, Inc., 80 F. App'x 124, 126 (2d Cir. 2003) ("The law is

well-established that federal courts hearing discrimination claims do not sit as a super-personnel

department" to reexamine a firm's business decisions.") (internal quotation marks and citation

omitted).  The Court therefore declines to reexamine Metro-North's evaluations of Wu's

performance.

        The only complained-of acts that a rational finder of fact might view as indicative

of indicate age- or disability-based animus are Haw's remarks to Wu that, if were in Wu's

position, he would have retired when the DBAs accreted to the TCU.  (See Pl. 56.1 St. ¶¶ 44.)

These remarks, however, do not demonstrate that Wu's workplace was "permeated with

discriminatory intimidation, ridicule, and insult that [was] sufficiently severe or pervasive to

alter the conditions of [his] employment and create an abusive working environment."  See

Harris, 510 U.S. at 21.  Indeed, "comments or questions about retirement, without more, do not

create a hostile work environment."  Mazur v. New York City Department of Educ., 53 F. Supp.

3d 618, 635 (S.D.N.Y. 2014); see also Hamilton v. Mount Sinai Hosp., 528 F. Supp. 2d 431, 447

(S.D.N.Y. 2007) ("[D]iscussion of retirement is common in offices, even between supervisors

and employees, and is typically unrelated to age discrimination.").  Such stray remarks do not

rise to the level of demonstrating that a hostile work environment existed.

        In light of the above, the Court finds that Defendants have successfully

demonstrated that Wu cannot sustain his burden of proving a hostile work environment claim.

The Court therefore grants Defendants' motion for summary judgment insofar as it seeks

dismissal of this claim.


CONCLUSION

For the foregoing reasons, the Court grants Defendants motion to strike the

declarations of  Jack Sim, Bradley Liu, Shaoming Chang and Pamela Sokolosky.  Defendants are

awarded their reasonable attorneys' fees and costs in connection with their motion to strike and

must file their properly-supported application for such fees and expenses within 21 days of the

date of this Memorandum Opinion and Order.  Any objection to the fee and expense application

must be filed within 14 days thereafter.  Any reply must be filed within seven days after the

objection is filed.  Courtesy copies of all filings must be provided for Chambers.

The Court grants Defendants' motion for summary judgment in its entirety, and

Plaintiff's Amended Complaint is hereby dismissed.  The Clerk of Court is directed to enter

judgment in Defendants' favor and to close this case.

This Memorandum Opinion and Order resolves Docket Entry Nos. 97 and 146.

SO ORDERED.

Dated: New York, New York
      August 4, 2016


      __/s/ Laura Taylor Swain__
      LAURA TAYLOR SWAIN
      United States District Judge